35 U.S. 269
 10 Pet. 269
 9 L.Ed. 420
 BURTIS RINGO, JAMES ELLIOTT, JOHN COLLINS, JOHN
ELLIOTT, JAMES LAWRENCE, THOMAS WATSON, ATHEY ROWE,
GEORGE MUSE, SEN. AND GEORGE MUSE, JUN., APPELLANTS
v.
CHARLES BINNS AND ELIJAH HIXON, STEPHEN HIXON, NOAH
HIXON, JOHN HIXON, WILLIAM HIXON AND TIMOTHY HIXON, HEIRS OF
TIMOTHY HIXON DECEASED.
 January Term, 1836
 
 1
 ON appeal from the circuit court of the United States for the district of Kentucky.
 
 
 2
 The facts, as stated in the opinion of the court, were the following:
 
 
 3
 The object of this appeal is to reverse the decree of the circuit court, by which the appellants were ordered to convey to the appellees, by deeds of release, with covenants of warranty against themselves and their heirs, and those claiming under them, all the right, title, interest and claim which they respectively have to lands embraced by a patent of two thousand acres to Charles Binns, Jun. and the heirs of Timothy Hixon, and their heirs, dated the 16th of October 1824.
 
 
 4
 It appears by the proofs in the cause, that a survey of two thousand acres was made on Indian creek, alias Fox's run, or Mason run, Henry county, Kentucky, on the 20th of November 1797, for John Alexander Binns and Charles Binns, by virtue of an entry made the 5th of August 1783. The original survey, by accident, or from the negligence of an agent of the Binns's, to whom it had been sent for such purpose, had never been registered and was lost, but a copy of it was preserved which determined with exactness the locality of the land. It was known as Binns's land in the neighbourhood, and by those owning the contiguous lands. John Alexander Binns transferred his interest in the survey to Husly Bagges, by whom it was sold to Timothy Hixon, the ancestor of Hixon the appellee. Charles Binns, in August 1819, appointed John Littlejohn his agent and attorney, with a power of substitution, to attend to this land and his other land in Kentucky, and Littlejohn associated with himself in such agency Burtis Ringo. Ringo, during the agency, and particularly whilst acting in concert with Littlejohn and William P. Rogers, to procure a division of the land between the appellees, called upon Rogers to ascertain when a division of the land could be decreed. Rogers told him there was a difficulty in the way, as the survey had not been returned to the register's office, and that no patent had ever been issued for the land. He received the information in May or June 1822. On the 10th of July following he wrote to Littlejohn, and after acknowledging that he had been requested to assist in dividing 'Binns's land,' he states that he had been at Frankfort; had made search for Binns's patent; but found the return of the survey had not been made, and that no grant had been issued.
 
 
 5
 He further says he supposed it would be unnecessary to be at any further trouble about it until Mr Binns had been heard from; as he had written to him, if he had a patent to send it on as soon a possible to Littlejohn or himself: and he requests Littlejohn to send it to him if Littlejohn should receive it. On the same day he wrote a letter of Binns, in which he says, having been requested by Littlejohn to assist him in dividing your lands between you and Mr Hixon's heirs, he had been in the register's office, and finding that the release of the survey had not been made, and that a grant had not been issued, he advises Binns to be at no further expense about it, as it appears no grant can have issued; and that Binns would be wrong if he thought there was no better right on the land. On the 8th of July, two days before he had written to Littlejohn and Binns, Ringo had taken from the register's office warrants for five hundred acres and one hundred acres of land, and caused entries and surveys to be made upon six hundred acres of the original two thousand acre survey, which had been made for John Alexander Binns and Charles Binns. The surveys were made on the 20th of July, and returned to the register's office in his own name on the 24th of August. When charged by Littlejohn with the fraudulent attempt upon the rights of those principals, and told that application had been made to the legislature of Kentucky to authorize a patent to be issued upon the original survey, on behalf of the Binns's, and that his conduct was known to a committee of the legislature, and might be attended with unpleasant consequences to himself; Ringo, to avoid them and to prevent a most notorious disclosure of his fraud, expressed in writing his willingness that such an act should be passed by the legislature, as the complainant had applied for, and gave to Littlejohn, under his hand and seal, a paper, of which the following is a copy:
 
 
 6
 'Whereas, it has been represented that I, Burtis Ringo, of Fleming county, state of Kentucky, had made two entries and surveys of six hundred acres of land, said to belong to John Alexander Binns and Charles, of Virginia, and that the said John A. Binns had sold to Timothy Hixon, now deceased, and that I had extended the surveys for my own benefit, though an agent under John Littlejohn for said Binns; I hereby disavow such intention, and do by these presents assign over all my right, title and interest in the said extends and surveys to Charles Binns and the said heirs of Timothy Hixon, to be carried into a grant at their proper expense; hereby renouncing all claim by virtue of said extends and surveys, and assigning them to the msavenns and Hixon's heirs. As witness my hand and seal this 4th day of November, 1822.
 
 
 7
 'BURTIS RINGO, [L. S.].
 
 
 8
 'Signed and acknowledged in the presence of us, Daniel Fechlen, John Littlejohn.'
 
 
 9
 Before this instrument was executed by Ringo, Littlejohn agreed to give him one hundred dollars, to reimburse the amount he had expended in procuring the warrants and making the surveys of the six hundred acres; paid him fifty dollars in Commonwealth paper, and gave him a note of hand for fifty dollars.
 
 
 10
 The legislature of Kentucky acted upon the petition of the complainants; passed an act on the 10th of December 1922, recognizing the survey of the 20th of November 1797, made on the entries of the 5th of August 1783; and the same was carried into a grant in favour of Charles Binns, Jun. and the heirs of Timothy Hixon and their heirs, on the 16th of October 1824. In the mean time Ringo, in violation of his transfer of the entries and survey for six hundred acres to Binns and the heirs of Hixon, took out a patent in his own name. The aforegoing facts were charged in the bill of the complainants; were denied by Ringo in his answers; but were established by proof at the hearing. In the original bill Ringo was the only defendant; but the complainants charge in it that the land had been occupied for ten or twelve years by tenants of Binns. By an amended bill, the tenants, James Elliott, John Collins, John Elliott, James Lawrence, Thomas Watson, Athey Rowe, George Muse, Sen. and George Muse, Jun., were made parties, and stated to be tenants in possession of the land claimed by the defendant; and the complainants make the same prayer against the tenants, as they had against Ringo in the original bill.
 
 
 11
 The circuit court made the following decree:
 
 
 12
 The court being now sufficiently advised of and concerning the premises, doth order and decree, that the defendants, Burtis Ringo, James Elliott, John Collins, John Elliott, James Lawrence, Thomas Watson, Athey Rowe, George Muse, Sen. and George Muse, Jun. do, on or before the sixth day of the next term, convey to the complainants, by deeds of release, with covenants of warranty against themselves and their heirs, and those claiming under them, all the right, title, interest and claim, which they respectively have to the lands embraced by the two thousand acre patent to Charles Binns Jun., dated 16th of October 1824; and the writ of haberi facias possessionem is awarded the complainants against the said defendants. And it is further ordered and decreed, that the defendants pay to the complainants their costs herein expended.
 
 
 13
 The defendants appealed to this court.
 
 
 14
 The case was argued by Mr French and Mr Underwood, for the appellants; and by Mr Semmes and Mr Coxe, for the appellees.
 
 
 15
 The counsel for the appellants presented the following points for the consideration of the court.
 
 
 16
 The counsel for the appellees contend the decree is erroneous, and must be reversed for the following reasons, to wit:
 
 
 17
 1. The decree has passed against John Collins, who is no party to the record.
 
 
 18
 2. The court has no power to decree tenants in possession merely to convey. They must either hold the legal title, or an equity to the land, growing out of the asserted title of the appellees. The appellees have shown neither.
 
 
 19
 3. The circumstances under which Ringo executed his relinquishment, were such that the contract cannot be specifically executed upon him by the chancellor.
 
 
 20
 1st. Because there was no consideration paid, or agreed to be paid Ringo for his claim. The 100 dollars was to indemnify him for expenses, in procuring his own claim; and not as a consideration for the purchasing it: and for the want of a valuable consideration the chancellor will not decree a specific execution of a contract.
 
 
 21
 2d. If the 100 dollars shall be considered as payment for his claim, it is wholly inadequate; and the inadequacy of price is an insuperable barrier to a specific execution.
 
 
 22
 3d. The deed was unfairly and fraudulently obtained by Littlejohn; and for that fraud the chancellor will refuse specific execution of the contract.
 
 
 23
 5. There is no proof that Elijah Hixon and others, claiming to be the heirs of Timothy Hixon deceased, are his children. Such proof is indispensable; and, for want of it, it does not appear they have any interest whatever in the land. They sue as heirs, and not as devisees; and the allegata et probata must correspond.
 
 
 24
 Messrs French and Underwood contended, that the equity relied on by the appellees is twofold.
 
 
 25
 1. They relied upon an entry for two thousand acres of land, carried into grant, in pursuance of a special act of the general assembly of Kentucky.
 
 
 26
 2. They relied upon a contract, by which they contend Ringo bound himself to transfer and assign to them his plats and certificates of survey; and thereafter fraudulently refused to comply, and obtained patents for the land in his own name.
 
 
 27
 If both these grounds of equity are untenable, the decree must be reversed and the bill dismissed.
 
 
 28
 To constitute a valid entry, it must call for objects notorious at its date; and it must be so special in its particular location, that others might appropriate the adjacent vacant and unappropriated lands with safety. This proposition is established by an unbroken chain of adjudications in Virginia and Kentucky; extending from the passage of the Virginia act of 1779, usually called the land law, down to the present time.
 
 
 29
 Now there is no proof in this cause showing the notoriety and specialty of the entry of the appellees. They cannot therefore succeed on that ground of equity.
 
 
 30
 The appellees cannot derive any equity from the patent, upon the entry for two thousand acres; because, before the emanation of the patent, the land had been appropriated by Ringo. He had vested rights, which could not be divested by a special act of the legislature of Kentucky. The entry had become void, by the failure to have it surveyed and carried into grant, as prescribed by law; and the land covered by it (if indeed it covered the land now in controversy, which is not proven nor conceded) was subject to appropriation by Kentucky land office treasury warrants. Ringo did appropriate it by such warrants. Thereafter the legislature of Kentucky could not constitutionally revive the equity, if any ever existed, under the entry for two thousand acres; so as to interfere with the rights of Ringo previously vested. Such a revival of a dead equity, would violate the rights which Ringo derived under his contract with the government. So far, therefore, as the decree rests for support upon the adverse title set up in the bill, it cannot be sustained.
 
 
 31
 Upon the second ground of equity relied on, the decree cannot stand. Under this head, the case presents itself as one for a specific execution of a contract. Applications of this kind are presented to the sound discretion of the chancellor. In this case he ought to leave the parties to their legal remedies; because, by depriving Ringo of his title, he will lose property of the value of 2000 dollars and more, without receiving therefor one cent. It is true that Ringo received 50 dollars in notes on the Bank of the Commonwealth, and the note of Littlejohn for 50 dollars more. But these sums were agreed to be paid as a remuneration for Ringo's trouble and expense in locating, surveying and purchasing his land warrants, under the idea that he acted in the business as agent for the appellees; and not as an equivalent or as a consideration for the land, regarding it as a sale and purchase. The whole transaction, as manifested by the record, exhibits nothing like the ordinary bargain and sale of land. But if that were the case, the court should not interfere and compel a specific execution, because of the inadequacy of the price.
 
 
 32
 Ringo was induced to execute the instrument, promising to assign his plats and certificates of survey, on account of the alarm excited in his mind by the representations of Littlejohn, that the legislature of Kentucky would institute proceedings to remove Ringo from office. An obligation thus obtained, should never be specifically enforced by the chancellor.
 
 
 33
 It was not fraudulent in Ringo to appropriate the land, upon ascertaining that the appellees had no title. If he obtained that knowledge while he was acting as agent for the appellees, there is no principle of equity which can preclude him from making a profit by the knowledge he had acquired; or which can convert Ringo into a trustee, holding the legal title for the use of the appellees. It might have been a friendly or benevolent act on the part of Ringo, on ascertaining that the appellees had no title, and that the land was vacant; to communicate the fact to the appellees, and advise them to purchase land warrants and locate them on the land. But his failure to do so, and his proceeding to appropriate the land for himself, cannot amount to a fraud on the appellees. If it does, he is guilty of it merely because he did not voluntarily communicate his knowledge of facts, and give the advantage of the speculation to the appellees; when he was not employed by them as agent for any such purpose, and when he was under no legal obligation to give them the benefit of his discoveries. As well might it be contended, that the common carrier, who is taking wheat to market, is legally bound to make known to the owner all the facts which he may have learned, and which have produced a sudden advance of fifty per cent on the price of the article; as to contend that Ringo, merely because he had a special agency in dividing the land, was bound, in consequence, to inform the appellees what discoveries he had made as to the title. If the carrier purchases the wheat, permitting the owner to remain ignorant of the facts which have operated to enhance the price, no court can or would deprive him of the profits of the speculation. Ringo's case deserves more favour, because the appellees had no interest whatever in the land which Ringo appropriated to himself. They supposed they had an interest and title to it; but this was a mistake. The land was vacant, and, like all vacant land, liable to be appropriated by those who might discover its situation; and in this respect, the appellees did not occupy a more favourable position than Ringo.
 
 
 34
 There are two grounds upon which the decree must be reversed, unconnected with the foregoing considerations.
 
 
 35
 1. There is no proof that the appellees are the children of Timothy Hixon deceased. They sue as his heirs. They must prove the facts upon which the court, as matter of law, can pronounce them heirs. There is no such proof. A witness cannot prove, in totidem verbis, that A is the heir of B: he must prove the degree of consanguinity; he must state the facts, and leave the deduction to the court. The will which shows that the appellees are devisees of Timothy Hixon, cannot sustain the bill which alleges they were heirs. The allegata and probata must correspond.
 
 
 36
 2. The record shows that the defendants, except Ringo, were the tenants of the appellees, entering upon the land under them in virtue of leases. The appellees cannot maintain a bill against their own tenants, to compel them to surrender their title and possession. The tenants are estopped to deny the title under which they entered, and if they held over, the remedy of the appellees was complete at law.
 
 
 37
 Mr Semmes, for the appellees.
 
 
 38
 The allegations of the bill are, without exception, sustained by the evidence filed in the cause. The answer of Ringo is rudis et indigesta moles of false assertions, personal vituperation, and untenable positions. Exceptions should have been filed in the court below; the answer referred to a master, and the offensive matter stricken out. The evidence falsifies every allegation in the answer. It is even impaired in credit, by the depositions taken to support it; they are merely negative, the witnesses 'knowing nothing' of the material facts.
 
 
 39
 The counsel for the appellants contended, that as Ringo had procured the elder grant, under which the legal title passed; his claim was superior in law and equity to that of the appellees. The reply to this argument is to be found in all the decisions of the states of Virginia and Kentucky on the subject, and of this court in 5 Cranch. The case of M'Clung v. Hughes, 5 Rand. 453, was a case in point. It was there held, and declared to be the settled law drawn from all the decisions, that a party having claim to lands entered and surveyed by another, should have recourse to the statutory remedy of caveat to prevent the emanation of a patent; that he is not to be sustained in a court of equity on such grounds as might have been used on the trial of the caveat; but that upon a case suggesting or proving that he was prevented by fraud or accident from prosecuting his caveat, equity will take jurisdiction of the case and grant relief. The effect of an entry is to give a party an equitable interest in the land located, to be clothed with the legal title only on the issuing of a grant or patent. Two parties entering the same land have each an equity; and if a subsequent locator should obtain a patent first, another maxim of equity will apply, that where the equity is equal, the law shall prevail, and his title to the lands is perfected; all equities being equal without regard to priority of time. The inequality proceeds from fraud or culpable laches; and to deprive a subsequent locator, with the legal title, for the benefit of this rule, it must appear that he was guilty of some act or laches, making it unconscientious in him to insist on his title.
 
 
 40
 Now what is such fraud? A has a prior entry and a subsequent patent. B has a subsequent entry but a prior patent. A's entry is a record; of this B must take notice; if not, his ignorance will not excuse him; if with this knowledge he locates the land entered by A, it is a fraud; and though he obtains a legal title by patent, his fraud will postpone him, and the prior equity will prevail. 5 Rand. 475, 476, 488, 489, 504.
 
 
 41
 These principles were recognized by this court in Bodley v. Taylor, 5 Cranch 191; and in Taylor v. Brown, 5 Cranch 234, it was decided that a subsequent entry, even without fraud, must be postponed to a prior—and although the subsequent locator produced a prior patent.
 
 
 42
 Does the present case come within the rule here laid down? It does, with the additional circumstance, that the subsequent locator here stood in a fiduciary relation to the prior, and made use of his situation to procure a knowledge of his principal's defect of legal title. If Ringo had a better title, his not proceeding to caveat the grant of the appellees, is evidence of his fraud under the circumstances of the case.
 
 
 43
 The appellants contend that the decree must be reversed:
 
 
 44
 1. Because it has passed against John Collins, who is no party to the record. This is not true, for the subpoena was served on him, as appears by the marshal's return; and if true, would not vitiate the decree as to the other appellants.
 
 
 45
 2. That the tenants on the land (who were made defendants by an amended bill) are mere tenants in possession; and the decree is for them to convey the legal title, i. e., that a decree for the legal title will not pass the possessory right! That a court of chancery has no jurisdiction over tenants in possession, but that the remedy is at law. The answer to this position is, that the bill does not name them, and aver that they are tenants in possession. They are made defendants, to do complete justice between all the parties in interest. But their own answer to the amended bill concludes them on this head. They allege that they do not claim either under the appellees, or the appellant Ringo; but that the legal title is in them, and attempt to prove it. They fail; the cause quoad their legal title was before the court; and a better title being proved in the appellees, warranted the court in a decree to convey.
 
 
 46
 3. That the relinquishment of Ringo was fraudulently procured. There is no proof of this; and throwing it out of the case, on the principles before established, we hold the better title
 
 
 47
 4. The answer denies that the complainants, Hixons, are the heirs of Timothy Hixon, and that there being only one witness in contradiction on this point, the answer is conclusive of the fact. The reply is, that to give an answer in chancery the force of evidence, per se, so as only to be rebutted by two witnesses or one witness, and corroborating circumstances; the answer, pro re nata, must be responsive to the bill, or in answer to some interrogatory in the bill. Affirmative allegations in an answer are in this respect on no better footing than those in a bill. On this point it is not responsive. If it were, the title of the Hixons and their identity are clearly made out by the evidence. And moreover, if it were responsive, and not positively contradicted by two witnesses; the fact, if important, could not avail, inasmuch as the answer being deprived of credibility in other respects, is so in this; for falsum in uno falsum in omnibus.
 
 
 48
 5. It is contended on behalf of the tenants in possession, that having occupied the lands more than twenty years, the act of limitations bars our title. But, 1. The act of limitations can only be taken advantage of by pleading it; that has not been done. 2. They must be looked on in the light of trustees for us, the entry in the surveyor's book being notice of our claim. 5 Rand. 475. The implied trust obviates the bar of the statute. 3. The fraud, the mala fides, inferred from this notice, will prevent the act from attaching. But, 4. They contend that the appellees have no title, but that the title is in them by virtue of this possession. If the appellees have no title, the lands are vacant, and they are pleading the statute against the state. Wild lands can only be appropriated by the regular mode of warrant, entry, survey and grant. Possession gives no title as against the state.
 
 
 49
 These tenants claim by purchase from Christy. They do not show the derivations of his title; set out no deed from Christy to them, nor state the purchase money or consideration of the conveyance. The evidence proves, that at one time they professed to hold under the appellees; at another, under the appellant Ringo; and now, only claim the legal title. Their claim to compensation for improvements on another's land, cannot, on the general principles of law, be allowed.
 
 
 50
 As to the form of the decree, it is precisely as in the case cited from 5 Cranch.
 
 
 51
 Mr Justice WAYNE delivered the opinion of the Court.
 
 After stating the case, he proceeded:
 
 52
 It is contended that the decree is erroneous and should be reversed. In behalf of Ringo it is urged that he has a prior legal title, unaccompanied by any equity of the complainants. The legal title must rest upon entry, survey, registry and patent; and it will be admitted that a legal title cannot be in any one until a patent has been issued; and further, that all of those requirements to make a complete title, shall have been done without fraud, to give to a patentee a valid title. If, then, in the course of carrying his surveys into grant, and before a patent upon them was issued to him, Ringo, under a notice to caveat the application of the complainants to the general assembly of Kentucky, for leave to bring in a bill to authorize a copy of these original surveys for two thousand acres to be received and registered, that a patent might be issued to them; acknowledged their equity to be superior to his immature legal rights, and expressed his willingness that it should be affirmed by legislative enactment; it being done by the legislature; its act nullified his surveys, and the latter could not be afterwards any foundation for a patent of the same land to himself. The complainants' entry and survey were raised by the legislature into a right to the exclusion of every right of Ringo; and any patent afterwards issued to him, upon his entries and surveys, is a nullity. The legal title of the complainants does not rest upon the statute for granting lands, but upon an act of the legislature directing an unregistered survey, inoperative by the lapse of time, to be registered, and a patent to be issued upon it. When this act was passed in favour of the complainants, the land covered by the survey, under the entry of the 5th of August 1783, became excepted from the mass of ungranted vacant land; and the complainants acquired rights in it which could not be defeated by a patent upon Ringo's entry and survey.
 
 
 53
 This view of the case makes it unnecessary for us to consider the objections to the decree growing out of Ringo's transfer of his entries and surveys to the complainants; namely, that there was no consideration paid, as agreed to be paid, for his claim; if there was, that it was inadequate, and that it was obtained by fraud. In truth, at the time that paper was executed, he had no legal or equitable interest in the land to convey and be transferred, no more than he was conscientiously bound to do; as he confessed and had so declared to others when he was making his surveys, that they were not made with an intention to appropriate them to himself, but to enable him to make a division of the land between the complainants.
 
 
 54
 But how forcibly does the equity of the complainants prevail over any claim of Ringo, when the latter is viewed as their agent at the time he made his entry and surveys upon the land, which he had undertaken to assist in dividing between them. It is said, that an unregistered survey gave to them no equitable right in the land; and that Ringo being only an agent for the special purpose of dividing the land, he could rightfully enter and survey it for himself when he ascertained the defect in the title of the complainants. The proposition of a want of equitable right in the complainants, is true as against the state: for the time within which the survey should have been returned and registered before a grant could issue had expired; and the land had fallen into the general mass of ungranted land liable to entry, survey and grant upon treasury land office warrants. But the mistake in the argument is, in applying the rights of the state in the land, to a right in Ringo, obtained when he was admitting to the complainants his agency, for them; and making acknowledgements of their title to others, to enable him more successfully to secure by his artifices a title in the land to himself. On the same day Ringo wrote two letters, one to Littlejohn and the other to Charles Binns. In both he acknowledges himself to be the agent of the complainants: but, by the tenor of his letters to Binns, he conceals from and misrepresents to Littlejohn, and under the pretence of a friendly wish to save Binns from unnecessary expense, he tells him that as no survey had been made and no grant had existed, that he need not go to any expense about it, as it appears no grant can now issue; that he will be wrong to think there was no better right to the land. These letters were written two days after he had commenced measures to secure the land for himself. The equity of the complainants, therefore, over any right of Ringo, does not arise from the former having had, at this time, any legal title to the land; but from Ringo's having practised an artifice upon the complainants, whilst he was their agent, to prevent them from curing the defect in their title, that he might deprive them of property which at the same time he acknowledged to be theirs. He was guilty of deceitful practices and artful devices, contrary to the plain rules of common honesty and fair dealing between men; and could not acquire a title to the land, valid against the equity which he had acknowledged to be in the complainants. It is unnecessary to pursue this point further. The decree of the court directing Ringo to convey, must be affirmed: and the proposition laid down by this court is, that if an agent discovers a defect in the title of his principal to land, he cannot misuse it to acquire a title for himself; and if he does, that he will be held as a trustee holding for his principal.
 
 
 55
 In regard to the tenants, the decree of the court must be reversed. They were made parties by an amended bill. In the original bill the complainants charge that the land had been occupied for ten or twelve years by tenants of Binns, and in the amended bill they are said to be tenants in possession of the land claimed by the defendant. Nor are they charged with fraud in either. It is not necessary, therefore, to consider the grounds urged in the argument of counsel for a reversal of the decree against the tenants, if a point arises upon the pleadings decisive of their case. Not having been charged with fraud on the bill, or placed by it in any such relation to the land or to the complainants, no case exists for the interference of a court of equity. Whether they occupied the lands as the tenants of Binns, or as declared in the original bill, or as tenants in possession under another; the complainants are to be supposed to have their remedy at law for the recovery of the land until they shall charge and show that the tenants obtained, and retain possession, in contravention of some equity subsisting between them and the complainants. The tenants are not so charged, nor is there any thing in the record from which such a conclusion can be drawn. They are merely shown to be in possession of parts of the original survey of two thousand acres, which was resurveyed by Ringo; and it is probable they hold under him; but there is no proof that they were parties to the fraud which he practised upon the complainants. This point does not appear to have been made in the hearing in the court below, nor was it urged in argument in this court; but it is obvious in the pleadings, and must be noticed by us: it is sufficient for the reversal of so much of the decree as relates to the tenants; and it will be directed with permission to the complainants to amend their bill, if they shall please to do so.
 
 
 56
 It was also urged that the decree should be reversed, on the grounds that there was no proof showing the complainants, the Hixons, to be the heirs of Timothy Hixon, and that the will of Timothy Hixon showed that the complainants should have claimed as devisees, and not as heirs.
 
 
 57
 The decree being reversed as to the tenants, neither point is material to them; and these objections cannot prevail against the affirmation of the decree as to Ringo, because the allegation in the bill of the complainants that the Hixons were the heirs of Timothy Hixon, is not denied in the defendant's answers, and was therefore not a point put in issue by the pleadings. Besides, the fact not having been denied by the answer, there are ample and frequent proofs in the record of Ringo's admission that they were the heirs of Timothy Hixon, and of his acknowledgements of their equitable right in the land in that character.
 
 
 58
 This cause came on to be heard on the transcript of the record from the circuit court of the United States for the district of Kentucky, and was argued by counsel; on consideration whereof, it is ordered, adjudged and decreed by this court, that so much of the decree of the said circuit court in this cause as directs the defendant Ringo to convey to the complainants be, and the same is hereby affirmed with costs, and that so much of the said decree as directs the tenants to convey to the complainants be, and the same is hereby reversed: and it is further ordered and decreed by this court, that this cause be, and the same is hereby remanded to the said circuit court, with directions for further proceedings to be had therein, in conformity to the opinion and decree of this court, and as to law and justice may appertain.