GARINGER et ux. v. PALMER.

(Circuit Court of Appeals, Sixth Circuit. January 4, 1904.)

No. 1,206.

1. EQUITY PRACTICE—REFERENCE—SCOPE.
 A party to a suit in equity is entitled to the judgment of the court upon the issues raised—especially those of law—and it is not competent for the court to refer the entire decision of the case to a master without the consent of the parties.

2. ATTORNEY AND CLIENT—ESTOPPEL OF ATTORNEY—ACTS INCONSISTENT WITH EMPLOYMENT.
 One who was for a number of years attorney for an insolvent judgment debtor and his wife, being employed whenever they needed the services of a lawyer, and who advised and assisted in transactions by which real estate owned by the debtor was transferred to his wife, and defended her title thereto when attacked by her husband's creditors, is estopped to afterward buy one of the judgments then outstanding against the husband, and enforce the same by a creditors' bill against the lands

held by the wife; nor can he be heard in a court of equity, in his own interest, to assert that the transfers by which she acquired the title were fraudulent.

Appeal from the Circuit Court of the United States for the Southern District of Ohio.

J. D. Post and J. M. Butler, for appellants.

Before LURTON, SEVERENS, and RICHARDS, Circuit Judges.

RICHARDS, Circuit Judge. This was an action brought by Charles A. Palmer against Stephen Garinger and Rebecca A., his wife, to set aside certain conveyances on the ground of fraud, and subject an alleged interest of Stephen in 12 separate tracts of land in Fayette county, Ohio, to the payment of a judgment recovered by the Merchants' & Farmers' Bank of Washington C. H., Ohio, against Stephen Garinger and others, on November 25, 1878, for $3,370.32, permitted by the bank to become dormant in 1892, purchased from it by Charles A. Palmer in 1899, and by him revived in 1901 for $9,375.36.

It was claimed in the petition that Stephen Garinger has a life estate in the first and second tracts, containing 223 acres, under the provision of the will of his father, David, who died in 1869, which devised the lands "to the heirs of the body of my son Stephen Garinger. * * * Stephen Garinger to pay the tax and have control and management during his natural life of his heirs' land and his heirs not to have possession till after his death"; that the third tract, containing 46 acres, belonged to him prior to January 9, 1882, and on that day was sold on execution, and bought in by his wife, Rebecca A. Garinger, with money furnished by him, for the purpose of placing it beyond the reach of his creditors; and that the remaining nine tracts were purchased with money earned by him principally through farming the first three tracts, and additional tracts as successively acquired, and was placed in the name of Rebecca for the same fraudulent purpose of keeping them beyond the reach of his creditors. The prayer was that the interest of Stephen in the first and second tracts be determined, that a trust be declared in his wife for him in the remaining tracts, and that the lands be sold and applied to the payment of the judgment.

In separate answers the defendants denied that Stephen Garinger took a life estate under his father's will in the first and second tracts, and alleged that whatever interest he took was terminated on January 21, 1882, when, having been sold for taxes, they were conveyed to Albert Garinger, as guardian of Stephen's children. As to the remaining tracts, it was averred they are the property of Rebecca—purchased with money borrowed, inherited, or earned by her. By amendments to the answers, a plea of estoppel in pais was set up; it being averred that from 1878 to 1889 Charles A. Palmer, the plaintiff below, was the attorney of Stephen and Rebecca A. Garinger, and no business step of importance was taken, except in accordance with his advice; that it was in accordance with Palmer's advice that the first and second tracts, when sold for taxes, were bought

in by Albert Garinger, as guardian for the defendant's children, and leased to Rebecca, who has ever since farmed the same; that Palmer was one of the attorneys for Stephen in the Dahl case, and at that time advised Stephen that he had no interest in the first and second tracts devised by his father; that Palmer was attorney for Rebecca in the Dahl case, and it was upon his advice that she purchased the third tract, consisting of 46 acres, at sheriff's sale, and has since farmed the same, and that from that time until 1889 Palmer was the attorney of Stephen and Rebecca A. Garinger in a number of suits, and advised them with respect to various matters growing out of Rebecca's ownership, control, and management of the first, second, and third tracts; that, acting as their attorney, Palmer became thoroughly conversant with their affairs, and, upon the strength of this knowledge, purchased from the Merchants' & Farmers' Bank the dormant judgment sued on in this case, paying for it less than $25.

Before these amendments were filed, the case, despite the objections of the defendants, was referred to a master, who seemingly sat as a court, admitted or excluded testimony as he saw fit, heard the arguments, and reported his findings of fact and conclusions of law upon all the issues to the court. Except as to the first and second tracts, the findings were in favor of the contentions of the plaintiff below. These findings were approved and confirmed by the court, judgment rendered, and the case is here on appeal.

The appellants, Stephen and Rebecca A. Garinger, were married March 23, 1865. Stephen's father, David, died in September, 1869, and from that time until about 1878 or 1879 Stephen, with his family, lived on the first and second tracts, devised to the heirs of his body, paying the taxes and farming the land. About 1871 he had become interested in the Wellston Coal & Iron Company. As the result of this side venture, he found himself, about the year 1878 or 1879, absolutely insolvent, with outstanding judgments, principally security debts, amounting to about $45,000. Among these was the one in favor of the Merchants' & Farmers' Bank sued on in this case, and also one in favor of George Dahl, recovered February 12, 1878, for $1,585. Obviously, under these circumstances, it became a matter of serious concern to Stephen Garinger and his young family what course he should pursue with respect to the three tracts of land then held and farmed by him. He had been paying taxes on this land, and depended upon it for the support of his growing family. What should he do in the future? The first and second tracts contained 223 acres; and the third, 46 acres. The first and second were ancestral land; the third, obtained by purchase. These three tracts were permitted to become delinquent for taxes for the years 1877, 1878, and 1879, and were bought in at tax sale on January 20, 1880, by Albert Garinger, a brother of Stephen, to whom a certificate issued. Afterwards, in accordance with the advice of Stephen's attorneys, the tax certificate was assigned to Albert, who was appointed guardian for the minor heirs of Stephen; and on January 21, 1882, a tax deed for the first and second tracts was executed and delivered to him as guardian. In his capacity as guardian he then rented this land to Rebecca A. Garinger, and it has since been farmed

in her name. As additional children have been born to Stephen and Rebecca, Albert Garinger has been appointed guardian for them, and from time to time has filed his accounts in the probate court. He is still guardian for those children who have not yet become of age.

Such is the situation with respect to the first and second tracts. It may be pertinent, in this connection, to say that the master finds, as matter of law, "that the title to the first and second tracts of land described in the petition, under the will of David Garinger, deceased, is vested in the children of said Stephen Garinger, and not subject to sale in this proceeding."

Coming to the third tract, in 1881 George Dahl filed his petition against Stephen Garinger and others, setting out that on February 12, 1878, he recovered a judgment against Stephen for $1,585; that Stephen was the owner in fee of what has been denominated the third tract, containing 46 acres, and had a life estate in the first and second tracts, containing 223 acres; that on October 30, 1878, Stephen had executed a mortgage for $1,479.83 to his mother, Cyrene Garinger, upon the first and second tracts; that at the November term, 1878, the Merchants' & Farmers' Bank had recovered a judgment against Stephen for $3,370.32, and at the November term, 1877, A. S. Ballard, Jr., had recovered judgment against Stephen and others for $8,014.57. The prayer was that Cyrene Garinger, the Merchants' & Farmers' Bank, and Ballard be required to set up their claims against the land; that the priority of liens be determined, and the land sold and applied to the payment of the judgment liens against it.

The Merchants' & Farmers' Bank was made a party to this suit, and served with summons, but filed no demurrer or answer, and made no effort to assert any lien either upon the land involved or its proceeds.

Cyrene Garinger filed an answer and cross-petition, signed by "C. A. Palmer, Her Attorney," in which she set up her mortgage on the first and second tracts; and Stephen Garinger filed an answer, signed by "C. A. Palmer, Harrison, Olds & Marsh, Attorneys for Defendant," in which he denied that he owned a life estate in the first and second tracts, and averred that under the will he was simply a special trustee to control and manage the estate for the use and benefit of his children, having no individual interest in the land. A reply was filed, and on November 25, 1881, a decree rendered, which, after reciting that Ballard and the Merchants' & Farmers' Bank had failed to answer or demur, and that the answer of Stephen Garinger related only to his interest in the ancestral land, granted an order of sale of the third tract to pay the Dahl judgment. Accordingly the third tract was sold at sheriff's sale to Rebecca A. Garinger, for about $2,900. The order confirming the sale provided that the proceeds should be applied, first, to the discharge of Albert Garinger's claim on account of taxes paid; second, in payment of the costs of the action; third, in satisfaction of the Dahl judgment; and, fourth, the balance to Stephen Garinger. Leave was given C. A. Palmer to withdraw the cross-petition of Cyrene Garinger. About $1,600 was needed to pay the outstanding tax title, the costs of the action,

and the Dahl judgment, and this was borrowed from Kelly Dixon on a note executed by Rebecca and Stephen Garinger. While Stephen receipted for the balance, he received, in point of fact, no money. It will be remembered that the Merchants' & Farmers' Bank was one of the judgment creditors in this case, but no judgment creditor asserted any claim to share in any part of the balance of the purchase price. It is to be noted, also, that Rebecca A. Garinger did not, in this suit, set up her dower interest in the land.

Such, in brief, were the transactions by which the first three tracts passed from the name and control of Stephen to that of his wife, and have ever since been farmed by her. The initial and fundamental fraud charged by the plaintiff below was in placing these three tracts beyond the reach of Stephen's creditors, and in appropriating their products and profits to the use and benefit of Rebecca in the purchase of the subsequent tracts. If these three tracts were rightfully placed and farmed in Rebecca's name, and the products and profits rightfully treated as hers in the purchase of additional land, or if the plaintiff below is not in a position to assert the contrary, in either event his case fails. Obviously, therefore, the first thing to determine is whether Charles A. Palmer is free to assert in a court of equity that these transactions were fraudulent. Unless he is, it is not worth while to proceed further, and this brings us to a consideration of the plea of estoppel in pais. Respecting this plea, the master found as matter of fact:

"I further find that the plaintiff was employed by the defendant Stephen Garinger in the capacity of attorney at various times prior and subsequent to the date of the sheriff's deed to Mrs. Garinger; that such employment was for special services, there being no general employment by the year or for any given period; that he was not employed by either Stephen or Rebecca A. Garinger as an attorney at law in relation to any of the lands described in the petition, save only as to the question of the interest which Stephen took in the first and second tracts under the will of his father, wherein his opinion was taken in connection with that of Richard A. Harrison as to the proper construction of that instrument; that the information he gained as to the title of the lands described in the petition was not obtained through or by reason of the relation of client and attorney which existed between him and said Stephen Garinger, but that it was a matter of common knowledge at Washington Court House, and readily obtained from the public records."

And as matter of law:

"That while recognizing the rule to be that an attorney can in no case, without the consent of his client, buy and hold otherwise than in trust any adverse title or interest touching the thing to which his employment relates, I find the acts of said plaintiff do not bring him within the operation of this doctrine, and that he is not estopped, by any act done by him in the capacity of attorney at law for said Stephen or Rebecca A. Garinger, from subjecting these lands to the payment of his claim."

Under the order made in this case, over the objection of the defendants, the master was appointed and "directed to take the testimony and report the findings of facts and conclusions of law to the court with all convenient speed, on the issues, and also upon the questions of costs and damages." By this order the entire case was referred to a master for a decision upon all the issues. This was done, not by consent of parties, but in the face of the protest of the

defendants. We think the defendants were entitled to the judgment of the court below upon the issues, and especially those of law raised in the controversy. As Mr. Justice Field, speaking for the Supreme Court, said in Kimberly v. Arms, 129 U. S. 512, 530, 9 Sup. Ct. 355, 359, 32 L. Ed. 764:

"It is not within the general province of a master to pass upon all the issues in an equity case, nor is it competent for the court to refer the entire decision of a case to him without the consent of the parties. It cannot, of its own motion, or upon the request of one party, abdicate its duty to determine by its own judgment the controversy presented, and devolve that duty upon any of its officers."

The findings of fact and conclusions of law reported by the master are not, therefore, entitled to the weight which would be accorded them if the reference had been one by consent of parties. The case is before us upon appeal, and we feel free to examine the record with a view of ascertaining how the issues raised in the case ought to be determined.

Stephen Garinger testified that after becoming insolvent, about 1878, he consulted Palmer as to the nature of the interest he took in the ancestral land under the will of his father, and was later advised by Mr. Harrison, of Columbus, and Palmer, that he did not take a life estate. He testified that it was in accordance with Palmer's advice that the first and second tracts, having become delinquent for taxes, were bought in by his brother, who was appointed guardian for the children, and rented to his wife, Rebecca, to be farmed by her thereafter. He testified that in the suit on the Dahl judgment, to which the Merchants' & Farmers' Bank was a party, Palmer, along with Mr. Harrison's firm, acted as his attorney, as well as the attorney of his mother, Cyrene. He produced the receipt of Palmer for fees he paid him in the case. He testified that Palmer was the adviser of his wife and himself when she purchased the third tract at sheriff's sale. He further testified that from that time on to 1889 Palmer was the attorney of his wife and himself, consulted in all important business matters, and intrusted with the handling of litigation in which they became involved.

The record shows that in August, 1882, shortly after the first three tracts had been placed in Rebecca's name, a levy was made by the sheriff on the personal property, including farm implements, stock, and growing crops, on the first, second, and third tracts, then being farmed by Rebecca. Palmer was employed to replevy this property for Rebecca, and signed and verified the petition alleging the property was hers. The property was worth about $2,500. The jury awarded it to Rebecca, except three horses and certain implements, the value of which was placed at $790. Rebecca borrowed this money, paid it to the sheriff, and retained possession of all the property, which she thereafter used as her own. It is to be observed that the question whether she or Stephen was entitled to the possession of these three tracts was necessarily involved in this case. If the right was in Stephen, the crops were his; if in Rebecca, the crops were hers. Palmer represented her in defending her possession, and presumably was advised of all the facts bearing upon the ques-

tion. It further appears in the record that from 1883 to 1888 Stephen Garinger was engaged in the grain and implement business as a member of the firm of Garinger & Baird. Baird put no capital into the business. The $1,200 which Stephen put in was borrowed from his wife. No money was made in this venture. The business was ultimately sold out to Baird's father-in-law, Lanum, and the notes received were transferred to Mrs. Garinger, who employed Palmer to bring suit and collect judgment. This he did. While the firm was in existence, Stephen Garinger deposited its money in the bank in his wife's name. He said he did this on Palmer's advice. Palmer denies this. It is certain, however, that Palmer acted as the attorney of Garinger & Baird, doubtless employed by Stephen, in three suits which were in the local courts in 1887 and 1888.

After the testimony was all in, and the arguments of counsel concluded, Palmer was permitted by the master to take the stand and testify in his own behalf. He stated that he was first consulted in the fall of 1879 by Stephen, who asked him at what time R. A. Harrison would be in town. The lands were delinquent for taxes, and Mr. Harrison and himself were to be consulted as to the interest Stephen took under the will in them. The employment flowing from this consultation lasted until January, 1880. He did not advise that the lands be permitted to become delinquent, because they were delinquent then. He says he did not advise the appointment of a guardian for the children, but admits that Mr. Harrison and himself discussed the question whether, in case the creditors filed a bill to sell the land, a forfeiture of the interest of Stephen might not be worked out by the appointment of a guardian. He says that, when Albert Garinger paid the taxes, he said he wanted to be appointed guardian, and he (Palmer) accompanied him to the probate judge and explained the purpose of the guardianship—to interplead for the children in the cases brought by the creditors to sell the land. Albert was accordingly appointed. The next day Palmer says Albert came back to him and told him he had spent the night before at Stephen's home, and that they had agreed that he (Albert) should rent the land to Mrs. Garinger. Accordingly Palmer drew the contract between Albert, as guardian, and Rebecca A. Garinger. On his direct examination he states that the rental was $200 a year—merely nominal—but, on his cross, admits that the care of the children was a part of the consideration. It may be remarked that, notwithstanding the guarded character of the admissions, it is evident that Palmer was the attorney of Stephen throughout the transactions that resulted in the ancestral lands being placed in control of the guardian for the children, and rented to Mrs. Garinger, to be farmed by her. The advice as to the nature of Stephen's interest, and what should be done with respect to the payment of taxes and the control and management of the land, was given in view of the fact that Stephen was insolvent, and that a suit in the nature of a creditors' bill on the Dahl judgment was filed or in contemplation. Palmer says he was not the attorney for Stephen in the Dahl case. He explains that he was the attorney for Stephen's mother, having drawn the mortgage Stephen gave her to secure two notes for the money loaned him, and that he filed a

cross-petition for her in the Dahl case, not seeking to sell the land, but simply to assert her lien in case others should sell. In other words, the mortgage was to cover up Stephen's interest, whatever that might be. But the answer filed by Stephen in the Dahl case simply sets out the nature of his interest in the ancestral lands, embodying in this form the advice given him by Mr. Harrison and Palmer upon this point. The answer was drawn by Mr. Harrison, and Palmer's name is signed by Mr. Harrison. The record contains a receipt by Palmer of money paid him by Stephen for fees in the Dahl case. We believe Mr. Harrison would not have signed Palmer's name without authority. We are satisfied that Palmer was acting in the Dahl case not only as the attorney for Stephen's mother, but as Stephen's attorney, and as the attorney for his wife. He represented all the Garingers interested in this land at that time, and his was the controlling mind which shaped their actions. Palmer admits that, after securing Albert Garinger's appointment as guardian, he prepared his accounts for years thereafter, and there are receipts showing this. He admits that he was employed in 1883 by Mrs. Garinger in the replevin suit, and says that Stephen came to him and had him file it, stating that his wife owned "the stuff on the farm." He admits that he acted as attorney for the firm of Garinger & Baird in three different suits, but denies that he advised Stephen to deposit the money of the firm in Mrs. Garinger's name. He states, however, that he did have a conversation with Stephen, in which Stephen told him that he (Stephen) had found out that he had a scamp for a partner, but that they were keeping the accounts in the name of Mrs. Garinger, and he did not think his partner could do much harm. He admits that in 1888 he brought suit on the Lanum note. He says Stephen brought it to him. He admits receiving, among others, three checks in 1889—one for $35, one for $15, and one for $10—all signed "R. A. Garinger per S.," given "on account of attorney fees." On cross-examination, Palmer admitted he was disbarred from the practice of law in Ohio, May 26, 1892; but the master refused to permit the question to be put to him, whether he was not disbarred upon specifications charging him with criminal conduct—conduct involving moral turpitude—one being that he had in a certain transaction taken fees from both sides, and raised a receipt from $3,000 to $5,000.

We have carefully examined all the testimony in the record bearing upon the relations which existed between Palmer, as an attorney, and Stephen and Rebecca A. Garinger. In the view we take of this case, it is of no consequence whether Palmer's employment was special or general. An estoppel may grow out of one as well as the other. It all depends upon the nature of the information acquired or the advice given by the attorney during the employment—whether special or general.

Neither is it material whether Palmer did or did not take the initiative in the scheme (if there was one) of placing the first three tracts in possession of Rebecca, to be farmed by her. It may be that the ancestral land was delinquent before he was consulted. It may be that

the lease of the land by the guardian to Rebecca was determined upon by the Garingers themselves. But if he aided as attorney in carrying out the scheme, it is precisely the same as if he had originated it.

The same thing is true with respect to the purchase of the third tract sold under the Dahl judgment. Whether he originated the plan of placing that tract in Rebecca's name, or merely helped carry it out, the result is the same. He cannot question its validity for his own benefit. We are satisfied that, as attorney, Palmer was a party to the placing of the first three tracts in Rebecca's name, to be farmed by her. In advising or helping this along, he assisted the Garingers in a course of conduct which was either proper or improper. If proper and valid, there is an end of this case; but, if improper and fraudulent, Palmer is in no position now to say so. He cannot now lay hands upon the land which, if his claim be true, he helped Stephen Garinger place beyond the reach of his creditors, to satisfy a judgment which was outstanding when the transfers were made, and which, since his employment as attorney ended, he has himself purchased.

The master finds the information Palmer acquired as attorney was matter of common knowledge at Washington Court House, and could be readily obtained from the public records. If so, why didn't the bank enforce its judgment? Why allow it to become dormant and sell it to Palmer after so many years? To be sure, the fact that the first and second tracts were being farmed by Rebecca, and were leased from the children's guardian, and that the third tract had been bought by her at sheriff's sale, and that the other tracts had been conveyed to her, might have been ascertained from the public records. But there was nothing in this to suggest fraud. To charge and prove fraud, the inside facts respecting the transfer of these tracts must have been known—such facts as were alone within the knowledge of the Garingers and their attorney.

It is now conceded there was no fraud in the renting by the guardian of the first and second tracts to Rebecca. The master finds that the title to this land is vested in the children of Stephen, and not subject to sale in this proceeding. The charge of fraudulent conduct is therefore directed against the third tract, bought at sheriff's sale under the Dahl judgment. The public could only know from an examination of the record that Rebecca had bought this land and paid for it with her own money, and that the proceeds were distributed as provided in the decree. It could not know that she borrowed the money to do this, and to pay the costs and taxes, from Kelly Dixon on a note signed by Stephen and herself; and that, in point of fact, Stephen did not receive the balance of the proceeds for which he receipted. But Palmer undoubtedly knew all this. He acquired the information as attorney for the Garingers, employed to defend their interest against certain outstanding judgments, among which was included the very judgment now sued on. When this tract was thus transferred to Mrs. Garinger, the judgment now owned by Palmer was outstanding, a lien upon the land, not dormant, but capable of immediate enforcement. Consider Palmer's position, and the restrictions and obligations flowing from it. Was he free then, while rep-

resenting the Garingers, to go to the bank and sell them out for a fatter fee? Certainly not. Was he free later, after collecting his fee in the Dahl case, to go to the bank and say: "I was not free awhile back to represent you, because I was then specially employed by the Garingers, but my special employment has ceased, and I am no longer their attorney. If, therefore, you choose to place your judgment in my hands, I will collect it for you on condition I receive one-half." Obviously not. The obligation of an attorney is not so ephemeral. Lapse of time makes no difference. Information privileged when acquired must always be held sacred. It cannot be sold to an adverse interest, either while the employment lasts or after it ends. Nor can it be used by the attorney against his former client through a purchase of the adverse interest.

So much for the character of the information acquired by Palmer while acting as attorney for the Garingers, which he now seeks to use in the enforcement of a judgment outstanding and adverse at the time he was employed to protect their interest. He cannot now use this against them. Nor can he be permitted to charge them with defrauding creditors in having pursued a course of conduct advised by himself as their attorney. By his present suit he proposes to reap the fruits of his own misconduct. A court of equity will not entertain the complaint of one who founds his claim for relief against fraud upon transactions in which he was the moving factor.

After a consideration of all the evidence, we have not the slightest doubt but that, as Stephen Garinger claims, Palmer was the attorney of himself and his wife throughout a series of years, from the time Stephen became insolvent until about the time when Palmer was disbarred; that, while not employed by the year, he was regarded by the Garingers as their regular attorney, who had advised and assisted them in putting the first three tracts in the wife's name, and who was consulted and employed whenever the services of a lawyer were needed, either by way of advice, or in attending to litigation growing out of their property or business transactions. He was employed to protect the Garingers in the use of the first three tracts, and in the enjoyment of their products and profits. He cannot now enforce against these lands, and the fruits of their cultivation, a judgment outstanding and adverse at the time he was thus employed. Nor can he now be heard in a court of equity to assert that the course of conduct pursued by his advice and with his assistance was in fact invalid and fraudulent. It is unnecessary to refer in detail to the many cases in which the courts have recognized and enforced duties and obligations growing out of the relation of attorney and client which are grossly violated by the plaintiff below. We content ourselves with citing some of the authorities: Ringo v. Binns, 10 Pet. 269, 280, 9 L. Ed. 420; Baker v. Humphrey, 101 U. S. 494, 502; U. S. v. Costen (C. C.) 38 Fed. 24; In re Boone (C. C.) 83 Fed. 954; Phillips v. Blair, 38 Iowa, 649, 653; Larey v. Baker, 86 Ga. 468, 12 S. E. 684; Carter v. Palmer, 8 Clark & Finnelly's, 657; Hobday v. Peters, 28 Beav. 349; Davis v. Kline, 76 Mo. 310, 314; Smith v. Brotherline, 62 Pa. 461; Kennedy v. Redwine, 59 Ga. 327; Hatton v. Robinson, 14 Pick. (Mass.) 416, 25 Am. Dec. 415; Wade v.

Pettibone, 11 Ohio, 57, 37 Am. Dec. 408; Downard v. Hadley, 116 Ind. 13, 18 N. E. 457; Brotherson v. Consalus, 26 How. Prac. 213; Briggs v. Hodgdon, 78 Me. 514, 7 Atl. 387; Turley v. Turley, 85 Tenn. 251, 1 S. W. 891; Belknap v. Cent. Trust Co., 80 Fed. 624, 26 C. C. A. 30, 47 U. S. App. 668; Emil Kiewart Co. v. Juneau, 78 Fed. 708, 24 C. C. A. 294, 47 U. S. App. 394.

Having reached the conclusion that the plaintiff below is estopped from enforcing the judgment sued on against the lands described in the petition, the judgment of the Circuit Court is reversed, with costs, and the case remanded, with directions to dismiss the bill.