NATIONAL WIRE BOUND BOX CO. et al. v. HEALY.

(Circuit Court of Appeals, Seventh Circuit. January 10, 1911.)

No. 1,717.

1. EVIDENCE (§ 442*)—PAROL EVIDENCE AFFECTING WRITING—MATTERS NOT INCLUDED IN WRITING.

Where a written contract was made in pursuance of a prior verbal contract between the parties broader in its scope, and as a means of carrying out a portion only of such verbal contract, the rule that a verbal agreement is conclusively presumed to be merged in a subsequent written contract does not apply, and the verbal agreement may be shown in a suit to determine the respective rights of the parties.

[Ed. Note.—For other cases, see Evidence, Cent. Dig. §§ 1874–1899; Dec. Dig. § 442.*]

2. TRUSTS (§§ 30½, 287*)—CONSTRUCTIVE TRUSTS—CONTRACTS CREATING FIDUCIARY RELATIONS—ENFORCEMENT OF RIGHTS IN EQUITY.

Complainant, who owned certain basic patents for machines for making wire bound packing boxes, entered into a general verbal agreement with defendants, which contemplated the exclusive promotion of the patents by defendants throughout the United States by means of the formation of corporations to manufacture under licenses to be granted by complainant: the royalties therefrom to be divided between the parties. Pursuant to said agreement, a written contract was executed giving defendants the exclusive right to organize corporations to be so licensed in certain territory; the understanding being that when it was covered other territory should be added. Defendants organized a corporation and established a factory to aid in demonstrating the business. The machines of complainant's patents were not altogether successful in operation, and it was further verbally agreed that any improvements made thereon by defendants should be patented and the patents assigned to complainant that they might be covered by the licenses to be given by him. Disagreements arose which stopped further operations under the written contract. Defendants in the meantime had made certain inventions relating to the art, some of which had been patented and others not, and, on their refusal to assign the same to complainant, he brought suit to compel such assignment. *Held*, that the contracts created a fidu-

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes
189 F.—4

ciary relation between the parties, and that defendants held the patents and inventions in trust, but that such trust was not in favor of complainant personally, but for the benefit of the common enterprise; that, such enterprise having been abandoned, a court of equity would deal with the matter as with a dissolved partnership, requiring defendants who had promoted certain corporations under their patents to account to complainant on the basis of their contract and to assign the patents for the benefit of the common enterprise or of the parties as tenants in common.

[Ed. Note.—For other cases, see Trusts, Dec. Dig. §§ 30½, 287.*]

Appeal from the Circuit Court of the United States for the District of Indiana.

Suit in equity by William P. Healy against the National Wire Bound Box Company, Samuel M. Robinson, Richard G. Inwood, and Perry C. Lavenberg. Decree for complainant, and defendants appeal. Reversed.

The decree appealed from orders appellants, within one month of the date of the entry thereof, to execute to appellee, his heirs and assigns, a written assignment of the invention known as "means for making box blanks," serial number 230,249, and the invention known as "a combined carriage and 'former' for wire bound blank machines," serial number 228,443; appellee, his heirs and assigns, being given control of such applications for letters patent in place of the appellants.

The decree further orders appellants to execute to appellee, written assignments of the following letters patent:

"1. Patent number 799,854, granted by the United States, on the invention of 'Improvements in Wire Bound Boxes,' later surrendered to the United States, and for which re-issued letters patent No. 12,725 was granted November 26, 1907 to the appellant National Wire Bound Box Company.

"2. Patent number 806,411, granted December 5, 1905, by the United States to the appellant National Wire Bound Box Company on said invention of the 'Box Blank Machine with Traveling Staplers.'

"3. Patent number 907,586, applied for December 4, 1905, granted to said National Wire Bound Box Company December 22, 1908. This patent covers said invention: 'Improvements in Wire Bound Boxes' except that the cleats are rabbeted instead of being step-mitered.

"4. British patent number 16,138 granted by the United Kingdom of Great Britain and Ireland on August 8, 1905, to Alfred Julius Boult and by him assigned on April 19, 1906, to said National Wire Bound Box Company of South Bend, Indiana, U. S. A., on said invention 'Improvements in Wire Bound Boxes.'

"5. British patent number 16,139 granted by the United Kingdom of Great Britain and Ireland on August 8, 1905, to Alfred Julius Boult, and by him assigned on April 19, 1906, to said National Wire Bound Box Company, on said invention, 'Box Blank Machines with Traveling Staplers.'

"6. French patent number 356,753 applied for and granted August 8, 1905, by the French Republic to said National Wire Bound Box Company on said invention 'Box Blank Machine with Traveling Staplers.'

"7. Austrian patent number 28,366 applied for August 8, 1905, and granted by the Empire of Austria to said National Wire Bound Box Company on said invention 'Box Blank Machine with Traveling Staplers.'

"8. Austrian patent number 30,972, applied for August 8, 1905, and granted by the Empire of Austria to said National Wire Bound Box Company, on said invention 'Combined Carriage and "Former."'

"9. German patent number 183,216 applied for August 9, 1905, and granted by the German Empire to said National Wire Bound Box Company, on said invention 'Box Blank Machine with Traveling Staplers.'

"10. German patent number 184,840, applied for June 9, 1906, and granted

by the German Empire to said National Wire Bound Box Company, on said invention 'Improvements in Wire Bound Boxes.'"

The decree provides that, in case the assignments thus ordered are not made, the same shall be made through the Master in Chancery.

Further facts are stated in the opinion.

Russell Wiles, Floyd R. Mechem, Daniel P. Murphy, and Philip C. Dyrenforth, for appellants.

Dan. W. Simms, Clarence W. Nichols, George T. Buckingham, and Arthur F. Durand, for appellee.

Before GROSSCUP, BAKER, and SEAMAN, Circuit Judges.

GROSSCUP, Circuit Judge, delivered the opinion. The decree appealed from is based upon the finding that the appellants Inwood, Lavenberg and Robinson were, at the date of the decree, and during all the time theretofore since the first day of June, 1904, jointly and severally trustees of appellee, and as such trustees, made each and all of the foregoing inventions for, and on behalf of, and for the sole use and benefit of appellee.

The testimony in the case is voluminous, covering 2617 printed pages. The findings of fact by the Master are also voluminous, covering 82 printed pages. The ultimate facts, determinative of whether the decree should stand or not, or what should be its modifications, can be more compactly stated.

The patents and applications involved in this suit relate to machines employed in the manufacture of wire bound packing boxes. Through corporations, the stock of which were owned by him, appellee was, at the time of his transactions with appellants, the owner of the broad basic patents covering this character of machine, together with the improvements that, up to that time, had been made thereon. This gave him full control, supposedly at least, of the art of manufacturing wire bound packing boxes by machinery. The patents and applications involved in this suit are mere improvements upon, and extensions of, this art.

The relations of the parties began in March 1904; in furtherance of which, in April 1904, the South Bend Healy Box Company was organized, of which appellants Robinson and Inwood (Lavenberg was subsequently included) were the sole stockholders and directors, and to whom was granted a license for certain territory therein named, lying around South Bend—the understanding being, that if this Company was successfully launched, Robinson, Inwood and Lavenberg were to have the further right to promote appellee's patents exclusively throughout the United States.

Up to this time, appellee had expended $62,000 of his own money, and ten years of time and effort, in introducing and launching his wire bound packing box enterprise commercially. The machines actually used for the making of boxes, at this time, were those known as the Rosback machines, and a later machine known as the Flora machine. The Flora machine, at this time, consisted in plans and working drawings made by the inventor. To the appellants Robinson, Inwood and Lavenberg, appellee exhibited these Rosback machines, and the plans

and working drawings of the Flora machine—the purpose, obviously, being to put appellants into possession of the knowledge of the art. The Rosback machines did not prove satisfactory. Rosback himself, the inventor, was employed for six weeks to make them operate, and with him worked Inwood and Lavenberg. Rosback then gave up the attempt and left the plant—appellants and appellee looking to the Flora patent to produce a machine that would be satisfactory. Appellants claim that the Flora machine also proved unsatisfactory, because it was found to be too expensive.

Up to this time, June 1, 1904, the general understanding had been, as stated, that Robinson, Inwood and Lavenberg were to have the exclusive promotion of the organization of corporations, under appellee's patents, throughout the United States. No formal contract to that end, however, was drawn. June 1, 1904 a formal contract was drawn, covering nine cities and the country adjacent thereto, within which Robinson and Inwood (Lavenberg subsequently becoming a party thereto) secured the exclusive right to organize box manufacturing and selling companies under appellee's patents. Subsequently other cities were added to these, and some territory exchanged for other territory. But at no time was the contract made to cover the United States. This contract, and the ones following it, granted to appellants the exclusive right to promote the organization of corporations within the territory named, for the purpose of manufacturing wire bound packing boxes by the patented machine of appellee, and selling the same according to the terms of a license and agreements, to be granted by appellee to each company so formed in each of such cities. Minimum license fees were fixed, as also minimum cash bonuses and a stock bonus of ten per cent., the bonuses to be divided one-third to appellee and two-thirds to appellants. Six months was fixed as the time within which these corporations should be organized and purchase their first set of machines, for failure of which the agreement was to forthwith cease and become void. This is known as the option agreement. The Master finds, however, that concurrently with this agreement "a general verbal understanding was reached * * * that the complainant (appellee) would give the defendants (appellants) promotion contracts of the general purport of the South Bend, Nine Cities and Cleveland contracts herein referred to, which should cover the United States, excluding the territory of Chicago, for which the complainant (appellee) had already given a promotion contract to a third person." Obviously, the restricted contract drawn was with a view of ultimately extending it to the whole of the United States, with the exception named, in case appellee's experience with appellants, in the specific territory named, turned out to be satisfactory.

The Master also finds that there was a general verbal understanding that Robinson, Inwood and Lavenberg would assign to appellee "any and all inventions made by them, relative to the wire bound box industry, and * * * would make and sign any papers necessary to enable the complainant (appellee) to get patents, and that there would be no charge or compensation for the complainant (appellee) to pay

them, and complainant (appellee) agreed to take out patents on such inventions so assigned him"—this understanding between the parties, that the ownership and control of all the patents relative to the wire bound box art should be in appellee, being a means to enable appellants to promote their contracts of promotion.

Pursuant to the relationship thus established, appellants entered upon the work of promotion, Robinson being chiefly engaged in looking up people with money who were desirous of investing, and Inwood and Lavenberg in fitting up the factory and getting ready to manufacture samples of the boxes to exhibit to prospective investors. As far as the record shows, however, no corporations were organized to the point either of distributing stock or cash bonuses, or of entering upon the actual manufacture or sale of the boxes; and the parties coming to a distinct misunderstanding in September 1904, further promotion seems to have been abandoned. It was during this period, June 1, 1904 to about September 13th, 1904, that appellants invented the machines covered by the decree—the purpose of the inventions, confessedly, being to remove the defects in the Rosback and Flora machines that appellants' experience with them disclosed.

Does this relationship warrant the decree entered, or any decree in favor of appellee? The decree is not based upon what is known in equity jurisprudence as specific performance, both because "such decree would not be consonant with the form and prayer of the bill of complaint; and because the evidence is not sufficient to warrant a decree for specific performance." (Master's finding.) The decree is based upon alleged rights "created by, and arising out of, fiduciary relations." Such was the ground upon which the Master put his recommendation of the decree; and, in the absence of an opinion, we assume that such is also the ground upon which the Court put the decree. Do the facts stated constitute a fiduciary relation between appellants and appellee, such as to prevent appellants from claiming these inventions as their own? Are appellants, upon this statement of facts, bound in equity to convey to appellee, at his instance, the inventions thus made, either absolutely, or upon equitable terms looking to the restoration of the statu quo?

In Davis v. Hamlin, 108 Ill. 39, 48 Am. Rep. 541, it was held that the agent of a lessee of a theatre building, who, by reason of his relation as such agent, learning that the lease was valuable and that the lessee, his principal, intended to have it renewed, went past the lessee and obtained a lease for himself, was a trustee for his principal in respect to such lease; and upon reimbursing the agent against his losses and liabilities, the principal could take over the lease, or let the agent keep the lease, as he (the principal) saw fit, exercising this option within a reasonable time. The same doctrine extends to other cases where agents, by reason of their relation as such, ascertained that the principal intended to make valuable purchases, and sought, without the knowledge of the principal, to obtain the benefit of the purchases to themselves. Gower v. Andrew, 59 Cal. 119, 43 Am. Rep. 242; Grumley v. Webb, 44 Mo. 444, 100 Am. Dec. 304; Ringo v. Binns, 10 Pet. 269;[1] Trice v. Comstock, 121 Fed. 620, 57 C. C. A. 646, 61 L. R.

[1] 9 L. Ed. 420.

A. 176; and Jones v. Dexter, 130 Mass. 380, 39 Am. Rep. 459 (a partnership case).

All these cases rest upon this reasoning, that the agent's knowledge, upon the possession of which he obtained the advantage, was gotten in consequence of, and as a part of, his relationship to his principal; that what he did, therefore, was in violation of his duty to his principal; and that what the Court should do, as nearly as possible, is to leave the agent, in the transaction named, precisely where he would have been left had he acted for the principal as he ought to have done, less any expense to which the principal has been subjected; and put the principal precisely where he would have been put had he, through the agent, obtained for himself what the agent had diverted to himself; in other words, that the transaction may come out as nearly in accordance with the way it would have come out, had there been no violation of duty, as the circumstances permit.

Can these principles be applied to the case under consideration? It is not essential, as we view it, that the parties should bear to each other the technical relation of principal and agent; neither need it be found that they were in the relation of employer and employé, or of partners. Technically their relation may have been that of principals, dealing with each other somewhat as partners deal with each other. The question is, whatever the relationship, do the equitable principles, governing the cases already decided, apply to this relationship; for equity, in seeking justice between man and man, not obtainable at law, does not stop precisely where the cases already decided have stopped. The chancellor has now, as had the chancellor in the past, the power and duty to apply old principles to new cases involving new relationships.

The case has been argued as if the entire relationship arose under the Option or Nine Cities contract, and the agreement of the parties respecting the inventions thereafter to be made. But the Option, or Nine Cities contract, was not the sole basis out of which the relationship grows. As found by the Master, and as already stated, there was a general verbal understanding that the relationship eventually should extend to the whole of the United States. Evidently, the purpose of the transaction between appellants and appellee was to unify, throughout the United States, the business of making this kind of box. To this end, the ownership and control of patents for this kind of box were to be unified; and corporations were to be organized, to which a common character of license should be granted; and to this end, all the inventions in that line, future as well as past, were to be kept together. Back of this Nine Cities contract was the broader matter in contemplation—a relationship that, when fully ripened, would unify the whole of this industry throughout the whole of the United States. The Nine Cities contract, and the additions thereto, were only the modus vivendi through which this broader relationship was to be eventually worked out. Only by grasping, in this way, the whole scope of the undertaking, can either the nature of the relationship, or the mutual obligations of the parties thereunder, be fully understood.

Upon the assumption that the fiduciary character of the relationship

grows out of the fact that appellee and appellants were principal and agents, counsel for appellants urge, that in every case in which the agent has been held as trustee, the "something" acquired by him must have been something that the principal himself might have acquired, had he acted in person; and inasmuch as future inventions are not something that the principal himself could have acquired—are something that, but for the inventors' creative faculty, would not have existed at all—they are not within the possible subject-matter of this doctrine of trusteeship through fiduciary relationship. This, though not the language, is the substance of the argument. We do not think it conclusive. Some one has said that "in every generality is an untruth." In this one, it seems to us, there is an untruth, which we do not know how to bring out better than to go outside of the field of inventions for an illustration. Take as such illustration the engagement, between two or more persons, to unify and control tracts of land in which there are natural gas deposits, in order that the gas may be utilized in manufacturing, and in the heating and lighting of cities. Unification here is an economic necessity. The law has come to recognize it as such. Gas deposits in reserve, sufficient for a long period of time, are just as essential as gas deposits already opened. The financing of expensive lines, and large distributing systems, require that, not only should there be a supply of gas for today and for this year, but for a sufficient length of time ahead to justify the investment. And besides unification, solidification of the holdings is essential; for adjacent lands, in the hands of others, may be used to draw off these very deposits that are intended to be kept in reserve. Indeed, no business enterprise of this kind is secure unless both unification and solidification have gone to the point, not only of having a sufficient reserve, but of being secure against the diversion of that reserve to others.

Is not the unification of ownership of inventions, relating to a given art, founded commercially upon the same considerations? A given lawful enterprise, to be successful, often depends upon its power to obtain the benefit of every improvement introduced. Protection for the future requires that inventions already controlled be not undermined and diverted by other inventions along the same line. An invention is not something that, but for the particular inventor or inventors, would not have been. Inventions come along as the discovery of gas deposits come along—the contribution of some particular person to the world's knowledge—but if not by that person, then, in the course of time, and usually in a very short time, by some one else. And where, in the development of business enterprise, it is necessary that there should be a look forward, as well as a look just around them, inventions in the future can be made the subject-matter of a fiduciary relationship, just as much so as the future discoveries of deposits of natural gas. Indeed, the grant by the government of a monopoly in these inventions, would, in most cases, be valueless unless they could be thus connected up, legally and equitably, future as well as in the present, with other like grants of monopoly looking to the promotion of some single practical business enterprise.

Now, suppose that in pursuance of a common purpose, entered upon

by a certain number of given persons, to get together the lands containing gas deposits deemed sufficient for the enterprise in hand, one of these parties, during the term of such relationship, and as a part of it, obtains knowledge of gas deposits within the territory contemplated by the enterprise, and thereupon obtains title for himself thereto, refusing to put them into the common enterprise. May not the others, upon showing what the scope of the enterprise was, and that such party was in it with them, deriving mutually a benefit therefrom, hold him as trustee to the arrangement? We think so, provided it is shown that the party got into the enterprise and obtained these advantages as part of, and in consequence of, his relationship to the others. To him, as to the agent in Davis v. Hamlin, the equitable principle applies that not to fulfill his obligations would be a violation of his duty to others, and to require him to fulfill his obligations, is one of the rights that others may draw upon him. If equity cannot act here, as in the familiar cases of principal and agent, it is because equity has no power to reach out and grow as conditions advance.

Commercially and industrially, the same principles apply to future inventions, included, by the understanding of the parties, in a present relationship, like the one between these parties; for the exploration of the laws of nature and mechanics, for something that will aid a specific commercial or business end, practically and commercially is not different from explorations for mineral or gas deposits to a like commercial end. Neither has any value until it is obtained. Both create a value that did not exist before they were obtained. One is the reclamation from the earth of something beneficial to commerce and industry; the other is the reclamation from the laws of mechanics or nature of something beneficial to commerce and industry. To both, once their boundaries are ascertained, the law gives the quality and protection of legal title. Both, equally, can be bought and sold and otherwise enter into business and commerce. Why should equity, dealing with them in the light of these commercial ends, run any distinction between them upon lines purely psychological; for it must be remembered that it is with inventions, as a part of commerce and industry, that we are dealing, not with inventions as a part of historical science; and it is by putting inventions, and the patents that embody them, into this, their true commercial setting, that courts can best carry out the purpose of our constitution and laws in protecting them, and, in the long run too, the best interests of the inventors themselves.

We are not overlooking the cases cited by appellants, Pressed Steel Car Co. v. Hansen, 137 Fed. 403, 71 C. C. A. 207, 2 L. R. A. (N. S.) 1172; American Circular Loom Co. v. Wilson, 198 Mass. 182, 84 N. E. 133, 126 Am. St. Rep. 409; Dalzell v. Dueber Watch Case Co., 149 U. S. 315, 13 Sup. Ct. 886, 37 L. Ed. 749; Deane v. Hodge, 35 Minn. 146, 27 N. W. 917, 59 Am. Rep. 321; Belcher v. Whittemore, 134 Mass. 330; Burr v. De La Vergne, 102 N. Y. 415, 7 N. E. 366; Hapgood v. Hewitt, 119 U. S. 226, 7 Sup. Ct. 193, 30 L. Ed. 369; Solomons v. United States, 137 U. S. 342, 11 Sup. Ct. 88, 34 L. Ed. 667; nor this rule drawn from them:

"The rule may be stated in a few words. No matter what the contract of service may be—whether for ordinary employment or for specific inventive

work—the master cannot have title to an invention of a servant, in the absence of an express contract to assign it to him, although made in the course of the service and at the master's expense. Stray statements which seem to point to the master's right of ownership are to be found in some opinions, but these decisions cannot stand as authorities against the main body of cases from which the above rule is gathered."

From this rule we are not dissenting. Before any case can be said to be made out, requiring appellants to assign their inventions, it must be shown that consciously, and knowing the effect of what they were doing, they expressly agreed to make the assignment. Persons are not to be deprived of their inventions merely because to retain them, under the circumstances, may appear unconscionable. The circumstances must include a contemplated assignment as their conscious act and deed. But such conscious act and deed need not have taken the form of a contract that, standing alone, is specifically enforceable. Such conscious act and deed is sufficiently shown, it seems to us, when it is made to appear that consciously, and knowing the effect of what they were doing, they became parties to a lawful undertaking that, to carry out the undertaking as an entirety, expressly involved, on their part, such an assignment. In other words, title will not be taken, by the courts, from the inventor, and given to another, upon a state of facts that does not involve proof that the inventor, consciously and knowing the effect of what he was doing, contemplated that the title should go to the other; the rule being to protect the inventor against everything except his conscious agreement. But it was not intended that he should thereby be circumscribed in what he consciously wished to do with his future inventions. The rule was to save him from advantage being taken of him by others, not to cut him off from opportunity to deal openly and fairly with others; and in the case before us, if these inventions are to be decreed to be assigned, it is upon the fact shown that appellants, consciously and knowing what was the effect of what they were doing, agreed that they should go into the common enterprise, contributing their future inventions to that enterprise.

[1] The question has been raised whether, in the light of the existing written contracts entered into between appellee and appellants, the conversations constituting the "general verbal agreement" are admissible at all. We think they are. The written agreements were not intended to merge and embody the understanding between the parties on the subject of the ownership of future inventions, but only to define the rights of the parties with respect to the particular city or territory for which a license was then to be granted. As already stated, the general understanding and agreement between the parties was one thing; it fixed their relations to each other. The particular written agreements was another and a different thing; they were only the modus vivendi of carrying out the general understanding as business conditions and opportunity developed. There is no ground, therefore, for applying the rule of law that verbal conversations are merged in a subsequent written agreement; for these subsequent written agreements were not accepted or acted upon by the parties as a written embodiment of the verbal agreement.

[2] There existed, then, between these parties, as we view it, a relationship that made them, appellee as well as appellants, agents to a common enterprise—agents by agreement—the principal being the common enterprise itself; a relationship that, faithfully carried out by appellants, required that they put in the name of appellee, but for the common enterprise, whatever they might invent in that line; and that, faithfully carried out by appellee, required that he extend (the appellants fulfilling their obligations) the scope of the common enterprise to include the whole of the United States—the specific option contracts being the mode employed. In what respect has this relationship failed? That appellants stand in a trustee relationship with respect to these inventions, to this common enterprise, we think is clear. That appellee stands, in relation to this common enterprise, as a trustee also, we think is clear. This clothes the court with power to enter a decree of some kind. It is the form of the decree that remains to be determined.

To determine what the form shall be, we must first inquire why it is that appellants did not perform their duty, as such trustees, in the assignment of the patents? And why is it that the enterprise has not been extended to cover the United States? For upon the answer to these questions, the form of decree depends.

September 13, 1904, the day that Inwood refused to assign the inventions to appellee, the condition of affairs, as found by the Master, was as follows:

The Rosback and Flora machines had been discarded by consent all around. The Brown machine, the step-miter machine, and the end stapling machine (some of the inventions in dispute) were in successful operation, making lapped boxes in the factory of the South Bend Healy Box Company, and were being exclusively promoted for appellee by Robinson, Inwood and Lavenberg, under their several contracts of promotion.

Everything was harmonious between appellee and appellants in reference to the promotion of the enterprise; almost daily conferences were held between them, and there were, substantially, no disputes or differences. Appellants were being aided by appellee by his advice and counsel. Appellee was hurrying up the building of the machines at the St. Joseph Iron Works, paying out of his own money for the building of them. Robinson, Inwood and Lavenberg were busy in the promotion of their several contracts.

At this time, appellee had promised another contract of promotion to Robinson, Inwood and Lavenberg for the Pacific slope and Mexico, and they were negotiating a contract to promote the city of New York; and further negotiations were on relative to the organization of the Cleveland Box Company. It was also expected that the Rood Lumber Company, of Columbus, Ohio, would take licenses, paying $10,000 cash and $25,000 stock bonuses, of which Robinson, Inwood and Lavenberg were to receive one-half, as their compensation for promoting Cleveland and Columbus.

Then something happened. Inwood refused, upon request, to assign to appellee the inventions of the adjustable "former" and step-

miter machines, and two days later, appellants having caused representatives of the Cleveland and Columbus prospective licensees to visit South Bend, for the purpose of inspecting the box machines in operation, and of seeing and consulting appellee as the owner of the patents, appellee refused to meet or consult with them, upon the ground that, inasmuch as Inwood and Lavenberg were refusing to assign the inventions, he (appellee) could not truthfully state and represent that he owned and controlled all the inventions relating to the enterprise. Here began the break. But to avoid this, appellee was requested, as an alternative, to meet and have the consultation respecting the promotion, remaining silent, for the time being, on the refusal of Inwood to make the assignment. This appellee refused to do, informing Robinson that he would meet the aforesaid representatives if Robinson insisted, but would inform them of Inwood's action in withholding from him the inventions. Robinson did not accede to this, whereupon Williams and Rood (the representatives of the prospective licensees aforesaid) were informed that appellee was too ill to be seen, and Williams and Rood went away from South Bend without meeting him.

From that time until the 3rd of October, the parties remained in negotiation; appellee threatening to write to Williams and Rood (who, in the meantime, had written to appellee asking for certain modifications in the proposed license) a letter that would have ended the negotiations, and appellants insisted that no such letter should be written. It appears also, from a letter of appellee, that during this negotiation he offered an option of the whole United States (this must have been in controversy), which was refused on the ground that appellee ought to fight the infringers in the Courts and not appellants. In this letter, written to appellant Robinson, appellee says:

"You tried to saddle that heavy expense on me. You and Inwood now claim that you were really ready to accept the option just as I drew it, but that I withdrew it sooner than you expected. In this I believe that you are telling the truth, but it shows that you played a game and got left and have been trying to retrieve your bad generalship ever since. You have stood on your legal rights, which you have a right to do. You and Inwood have both told me (and others) that what I demand (the inventions), is not in the license. I will also stand on my legal rights. You will get what the law will give you, and no more, as to options and licenses."

This was the end of their active connection. Soon thereafter the National Wire Bound Box Company was organized, to whom was transferred the inventions in dispute. No further companies were organized and no further territory offered. The Nine Cities contract, and other contracts, lapsed by their own terms. War between the parties succeeded peace. How it was conducted need not be elaborated, for it throws little light upon how the parties had come to the parting of the ways.

We cannot find that appellee, in thus breaking with appellants, was in the wrong. As viewed now, after these full discussions in the courts, he may have been technically in the right in demanding that the inventions be first assigned to him. But we can find nothing in the record showing that he stood upon his right as a trustee for the com-

mon enterprise, to cover, eventually, the United States—demanding the assignment to him as such. Appellants, very properly, may have been apprehensive that, to make such an absolute assignment of patents without further safe-guards, would have put them, and their common enterprise, wholly in appellee's hands.

Nor were appellants wholly in the wrong. They seemed to have had the promotion of some of the contemplated corporations well in hand, and to have been ready to go on with the common enterprise, reserving for future discussion the question of assigning the patents to appellee. They did not know then what the law on the subject is now declared to be; and it is altogether possible that future conferences might have so safe-guarded their interests in the common enterprise that the patents would have been assigned. On the whole, this branch of the case appeals to us as analogous to those many cases where partners fall out, neither being wholly to blame. And the attitude of a court of equity ought, perhaps, to be analogous to the attitude of a court of equity toward a partnership thus dissolved.

In the winding up of partnerships, courts of equity are not governed too much by the question of which partner technically is right, and which partner technically is wrong—seeking rather, in the distribution of the partnership assets, that each partner should get his rightful interest therein. Is this a case (practically the winding up of a common enterprise) where great stress should be laid on the technical right and technical wrong of the parties? Partners cannot be kept together by a decree in equity; neither can this enterprise be kept together, according to the original understanding, contrary to the will of these parties. To give these inventions absolutely to the appellee, on the basis of the Nine Cities or Option contracts, would be to ignore the larger understanding behind those contracts; to leave the inventions with the appellants, would be to ignore the rights that the appellee has fairly obtained in them. The exact statu quo cannot be restored; four years time and much bad feeling have intervened. What, nearest to a restoration of the statu quo, can a court of equity do?

The fairest and most equitable thing, as it seems to us, is to deal with this common enterprise as we would with a dissolved partnership, giving to each of the separating parties, as nearly as possible, his interest in the assets that have grown out of the common enterprise. Those assets, so far as we know, are the royalties contracted for by appellants, the interest that appellants have obtained in the corporations promoted by them under their inventions, contrary to their duty to the common enterprise, and the inventions themselves. Possibly there is something more. To a large extent, the parties have already agreed upon the measure of each party's interest in these assets. The best way may be to adopt that agreement as the measure of each party's interest; which would require appellants to account to appellee for what would have been his proportion in all the corporations promoted by appellants, the same as if the original understanding had been carried out; and his proportion of the royalties; as also an assignment to appellee of the inventions involved, either as trustee for the common enterprise, or as a tenant in common to the extent of his right

therein as one of the parties to the common enterprise; this decree not to affect the patents owned or under the control of appellee prior to the common enterprise, because, although they were to have been utilized in that enterprise, they are in no sense a product of the enterprise. Whatever is a product of the enterprise, wherever now held, is, of course, to be included in the accounting.

The decree of the Circuit Court is reversed, with instructions to enter a decree in accordance with this opinion; the costs of this appeal to be divided.

SEAMAN, Circuit Judge (concurring). I concur in the conclusion of the foregoing opinion that the appellee is entitled to relief through a decree as therein directed, but rest concurrence on the express contract of the appellants (in evidence) to assign and place, for benefit in their joint enterprise, such inventions as were made by either in the course of promotion. Under the line of authorities cited in the opinion, I believe no other relation of the parties (fiduciary or contractual) in their undertaking can sanction such relief, nor furnish support therefor, beyond the undoubted weight of the evidence thereunder in corroboration of the testimony that inventions made were to be assigned. In reference to the proof of express contract, I am not impressed with doubt of the sufficiency of the appellee's testimony, if accepted as the true version, to constitute an enforceable contract, as it becomes well defined under the evidence. Its credibility is supported, both by the circumstantial evidence and by the finding of the master; but I have hesitated over its acceptance on the question of admissibility—whether it may not tend to vary the written contracts in suit. On re-examination of the evidence, however, I am satisfied that the several license agreements referred to were portions only of their general agreement for the enterprise, and were neither understood nor intended to embrace their various mutual undertakings, resting on other evidence in the case. Thus the testimony became admissible and supports the decree as directed.