CRESSEY v. INTERNATIONAL HARVESTER CO. OF AMERICA

(Circuit Court of Appeals, Ninth Circuit.   May 5, 1913.)

No. 2,194.

1. EVIDENCE (§ 442*)—PAROL EVIDENCE AFFECTING WRITING—ADMISSIBILITY.

A written contract which required plaintiff to devote his whole and undivided time to the service of defendant, and to perform such service to the best of his ability, and which fixed his compensation therefor must be presumed to embody the entire agreement of the parties with respect to the subjects dealt with, which are the services to be rendered and the consideration therefor, and plaintiff cannot recover on an alleged contemporaneous parol agreement that he should use extraordinary efforts and devote extra time to the work, and should receive, in addition to the stated salary, a bonus or commission measured by the results obtained.

[Ed. Note.—For other cases, see Evidence, Cent. Dig. §§ 1874–1897; Dec. § 442.*]

2. MASTER AND SERVANT (§ 21*)—CONTRACT OF EMPLOYMENT—PROVISIONS FOR TERMINATION.

Where a contract for personal services provided that it might be terminated by either party by giving 30 days' notice, but further provided that the employer might terminate it at any time for neglect of duty, refusal to follow instructions, or if it should consider the employé's work unprofitable or undesirable, "in which event compensation shall cease the day and date the agreement is terminated," its termination by the employer without giving its reasons was presumably for one of the causes specified, and the employé cannot recover compensation after such date.

[Ed. Note.—For other cases, see Master and Servant, Cent. Dig. §§ 20, 21; Dec. Dig. § 21.*]

In Error to the District Court of the United States for the District of Oregon; Robert S. Bean, Judge.

Action at law by J. A. Cressey against the International Harvester Company of America. Judgment for defendant, and plaintiff brings error. Affirmed.

S. A. Keenan, of Seattle, Wash., for plaintiff in error.

Cole & Cole, of Portland, Or., for defendant in error.

Before GILBERT and MORROW, Circuit Judges, and WOLVERTON, District Judge.

WOLVERTON, District Judge. This was an action to recover money upon contract. Certain parts of the complaint were stricken out upon motion. Subsequently a demurrer was sustained to the complaint with the clauses thus stricken. Judgment having been rendered in favor of the defendant for its costs and disbursements, the plaintiff brings his writ of error for review.

Defendant is a manufacturing institution, engaged in the manufacture, sale, and distribution of farming implements and machinery. As such it employs agents in its service for selling its products and collecting from purchasers the sales prices. The complaint sets forth a great deal by way of inducement. Omitting much of such matter, it alleges in substance: That it was the universal practice and custom of the defendant company in South Dakota, at all times mentioned in the complaint and for a long time prior thereto, to pay its collecting agents a bonus or commission over and above the fixed salary stated in its printed contracts, provided the agent reached a certain standard set by the company, and kept his expenses below a fixed limit. That the company, according to its custom, and for its own special reasons, never incorporated the agreement to pay said commission or bonus in its printed contract for the stated salary. That on July 10, 1908, plaintiff was employed as collecting agent at a fixed salary of $125 a month in addition to a bonus or commission as hereinafter stated. That in the agreement represented by said printed form, and in accordance with the universal practice and custom of the defendant and its agents, the latter were not to be engaged in any other business, nor to be employed by any other person or company, while in defendant's employ, and were to be paid a fixed salary and all their necessary expenses. That on or about July 1, 1908, defendant, through its general agent,

J. C. Sheldon, at Sioux Falls, S. D., solicited plaintiff to enter its employ as such collection agent, requesting him to sign one of its printed contracts at a fixed salary of $125 per month. That at that time plaintiff was familiar with defendant company's custom of paying said bonus or commission, and as an inducement and consideration for the plaintiff's signing the said contract defendant, through its said general agent, promised and agreed that, if plaintiff would sign said contract and enter into its employ, and continue therein during the balance of 1908 and all of 1909, it would pay him, in addition to the fixed salary as stated in said printed contract, a bonus or commission for the year 1909 as more specifically hereinafter set out. That, relying absolutely upon defendant's promise and agreement to pay the said bonus or commission, plaintiff signed one of defendant's printed contracts, wherein the fixed salary is stated at $125, a copy of which contract (bearing date July 13, 1908) is annexed to the complaint, marked "Exhibit A." That $125 per month was not the real consideration for the execution and delivery of the contract, but was only a part thereof, said bonus or commission being the real incentive and consideration for plaintiff's entering into defendant's employ, which defendant well knew. That at the time of the signing of the printed agreement and the execution and delivery thereof, and in consideration of plaintiff's signing and executing the same, and as an inducement for his signing and executing said contract, defendant promised and agreed that, if plaintiff would use extraordinary efforts in the handling and collection of its commercial paper, reduce his personal expenses to the limit fixed in the schedule, devote extra time to the collection and securing of said paper and the performance of other services for the defendant outside of and beyond that required by said printed contract, such as working overtime on holidays, Sundays, and nights, and on desperate claims or those considered uncollectible, and remain in its employ until January 1, 1910, and, further, if plaintiff collected desperate claims aggregating $2,500 between January 1, 1909, and January 1, 1910, the total cost and expense to defendant for the collection of its paper in cash or secured notes not exceeding the following schedule, plaintiff should receive as a commission or bonus the difference between the amount fixed by said schedule and the actual cost and expense to defendant: "For the first eight months of the year—that is, from January 1 to September 1, 1909—per cent. cost on cash collected, 7 per cent.; per cent. cost on claims secured, 5 per cent. For the four months of the year from September 1, 1909, to January 1, 1910, per cent. cost on cash collected, 2 per cent.; per cent. cost on claims secured, 2 per cent." That, relying upon said promise and agreement of the defendant, plaintiff signed the written contract and entered into the service of the defendant company. That plaintiff was enabled to collect cash between January 1, 1909, and September 1, 1909, $22,373.-53, and to renew and secure notes and claims during the same period, $12,340.05. That the total expense incurred by plaintiff during the period, including his salary, was $1,590.41. That plaintiff collected cash from September 1, 1909, to January 1, 1910, $112,140.29 and renewed and secured notes to the amount of $11,290.24. That his total expense in making such collections and procuring renewals was $884.47. That

plaintiff collected more than $4,000 desperate claims during the same period. That plaintiff earned thereby the total sum of $2,172.78, no part of which has been paid except $89.82, leaving a balance due from defendant to plaintiff of $2,082.96.

The contract (Exhibit A) provides as follows:

"That the first party hereby hires the second party to serve and to perform such duties and at such places as it may from time to time direct; and the second party agrees to faithfully perform to the best of his ability all the duties and responsibilities of such service, and to devote his whole and undivided time to the party of the first part during the continuance of this contract, and not to engage, or to be engaged, nor to be interested in other business during the existence of this contract.

"In consideration the first party will pay to the second party at the rate of one hundred twenty-five and no/100 dollars ($125.00) per month and necessary traveling expenses actually incurred in the business while away from Aberdeen, S. D., his home or usual place of residence.

"This contract to be in force from 15th day of August, 1908, until canceled, which may be done by either party hereto, without liability for damage, by giving written notice."

On August 10, 1909, plaintiff and defendant entered into another contract of like nature, in which the defendant agreed to pay plaintiff the sum of $137.50 per month and necessary traveling expenses, which contract is set out, marked "Exhibit B," and made a part of the complaint, and as to which it is alleged that it was entered into under the same terms and conditions and understanding as the previous contract marked "Exhibit A."

The second cause of action is for a month's salary in the sum of $125, and is based upon a contract, a copy of which is attached to the complaint, marked "Exhibit D." This contract provides, among other things, that:

"Either party may terminate this agreement by giving thirty days' notice to the other party. The first party may terminate the agreement at any time for neglect of duty, refusal to follow instructions, or should it consider second party's work unprofitable or undesirable, in which event compensation shall cease the day and date the agreement is terminated."

[1] The principal question presented for our determination is whether the written contract embodies in legal intendment the entire understanding of the parties as it relates to the plaintiff's employment by the defendant. Strictly speaking, the question is not whether that which it is sought to have added to the written contract is matter varying the terms thereof, but whether the matter is or is not already integrated; that is, in legal effect, written into the memorial which the parties have adopted as the final embodiment of all the terms and conditions of their contract. Mr. Wigmore, in his admirable work on Evidence (Vol. 4, p. 3409), puts the proposition thus:

"When a legal act is reduced into a single memorial, all other utterances of the parties on that topic are legally immaterial for the purpose of determining what are the terms of their act."

Speaking further to the subject (page 3426), the same author says:

"The inquiry is whether the writing was intended to cover a certain subject of negotiation; for, if it was not, then the writing does not embody

the transaction on that subject; and one of the circumstances of decision will be whether 'the one subject is so associated with the others that they are in effect 'parts' of the same transaction, and therefore, if reduced to writing at all, they must be governed by the same writing."

And again the learned author, still pursuing the same subject (pages 3426, 3427), says:

"Whether a particular subject of negotiation is embodied by the writing depends wholly upon the intent of the parties thereto. * * * In deciding upon this intent, the chief and most satisfactory index for the judge is found in the circumstance whether or not the particular element of the alleged extrinsic negotiation is dealt with at all in the writing. If it is mentioned, covered, or dealt with in the writing, then presumably the writing was meant to represent all of the transaction on that element; if it is not, then probably the writing was not intended to embody that element of the negotiation."

An illustration is cited from Webb v. Plummer, 2 B. & Ald. 746, 750, as follows:

"Where there is a written agreement between the parties, it is naturally to be expected that it will contain all the terms of their bargain. But, if it is entirely silent as to the terms of quitting, it may let in the custom of the country as to that particular. If, however, it specifies any of those terms, we must then go by the lease alone."

Another illustration may be found in National Wire Bound Box Co. v. Healy, 189 Fed. 49, 57, 110 C. C. A. 613, 621:

"The question has been raised whether, in the light of the existing written contracts entered into between appellee and appellants, the conversations constituting the 'general verbal agreement' are admissible at all. We think they are. The written agreements were not intended to merge and embody the understanding between the parties on the subject of the ownership of future inventions, but only to define the rights of the parties with respect to the particular city or territory for which a license was then to be granted. As already stated, the general understanding and agreement between the parties was one thing; it fixed their relations to each other. The particular written agreements was another and a different thing; they were only the modus vivendi of carrying out the general understanding as business conditions and opportunity developed. There is no ground, therefore, for applying the rule of law that verbal conversations are merged in a subsequent written agreement; for these subsequent written agreements were not accepted or acted upon by the parties as a written embodiment of the verbal agreement."

In the light of this method of examination as stated by Mr. Wigmore, we quote from counsel's brief (not being able to obtain the book) what Mr. Greenleaf has to say upon the subject:

"Even though there has been an integration—i. e., a reduction of a transaction to a final and exclusive written memorial—yet, since several transactions may be consummated by the same parties at the same time of negotiation, and since the parties may integrate one of these transactions and not another or may integrate one part of a transaction and not another part, it is, of course, always open to show that the integration was partial only; and in such case the terms of the remainder, not covered by the written memorial, may be gleaned from anything said or done by the parties independently of the writing. Effect is given to the written memorial as exclusively representing the terms of the transaction, but only because the parties have so intended it, and therefore only so far as the parties have intended it. Since all depends thus on the parties' intention as to the extent or scope of the integration, the application of the principle will depend almost entirely on the circumstances of each case, including the kind of

transaction, the usual terms of such transactions, the scope of the writing, and the surrounding circumstances of the particular negotiation. No detailed rules can be formulated; and the working of the principle can best be understood by noticing its application in particular instances." 1 Greenleaf on Evidence (16 Ed.) 445.

The principle must be recognized and applied that the transaction should be considered in the light of all the facts and circumstances surrounding and attending it which may by legal inference have induced or prompted the parties in their understanding when the written memorial was executed by them. The complaint is very full as to all matters of inducement leading up to the execution, and there seems to exist no good reason why the controversy may not be determined as well upon the demurrer as otherwise.

A close analysis of the contract in the light of the foregoing authorities will serve in large measure to determine the issue. It is alleged, in brief, that the plaintiff, being aware of the custom of the defendant to pay its collecting agents over and above the salary fixed by the company and specified in its printed contracts, provided the agent earned through his commissions a greater sum than such specified salary, signed one of such printed contracts. It further appears that he signed another more than a year later. The written contract provides that plaintiff shall perform such duties and at such places as the company may from time to time direct, shall faithfully perform, to the best of his ability, all the duties and responsibilities of such service, shall devote his whole and undivided time to the company during the continuance of the contract, and shall not engage nor be interested in other business during the time. The company agrees to pay plaintiff for his services $125 per month by the first contract, and $137.50 by the second, and his necessary traveling expenses actually incurred. It is further alleged in this relation that the defendant company, in consideration that plaintiff would sign these contracts, use extraordinary efforts in making collections and securing claims, devote extra time to such work, perform other services outside of that required by the written contracts, and reduce his personal expenses to the limit fixed in the schedule, promised and agreed to pay plaintiff a commission or bonus equal to the difference between the amount fixed by the schedule, namely, 7 per cent. on cash collected and 5 per cent. on claims secured between the dates of January 1 and September 1, 1909, and 2 per cent. on cash collected and claims secured betwen September 1, 1909, and January 1, 1910, and the actual cost and expense to the defendant for making collections and securing claims, including the salary of the plaintiff as fixed in the written contracts. Thus it will be seen that the alleged additional contract, read in connection with the written contracts, accords to the plaintiff for his services, ordinary and extraordinary, and for overtime, the fixed salary named in the written contracts, together with the excess of commission called a bonus above the cost of collections including such salary. Now, the elements of each of these contracts are simply the consideration and the service to be rendered. The consideration under the written contracts is the sums named therein. The consideration under the alleged verbal contract is, in effect, the sums

named in the written contracts plus the bonus, because the defendant company is required to pay to the plaintiff the sums named in the written contracts as a part of the expense of collecting and securing claims. This as it respects one of the elements of these contracts. As to the other element, the plaintiff agrees, under his written contracts, to devote his "whole and undivided time" to the service of the defendant company. Under the alleged added or supplemental contract, he agrees to make extraordinary efforts and devote extra time to the service, but both contracts contemplate the giving of his personal services, the one ordinary and the other extraordinary, to the defendant company. These elements are the subjects dealt with by the parties in the transaction touching plaintiff's employment. As to the consideration, the same subject-matter enters in part into both the contracts, and as to the service, the same subject-matter is, in effect, dealt with, namely, the "whole and undivided time" of plaintiff—call it ordinary or extraordinary. It is somewhat anomalous that a person engaging to devote his whole time to a service should be able to devote extra time thereto, where the service is personal. So that, under the rule laid down by Mr. Wigmore, there is such an association and near relation of the subject-matter dealt with and comprised by the written contract and the alleged oral contract as that it must be presumed that the parties intended to incorporate all their negotiations relative to the subject-matter into one memorial or contract, which must be held to be evidenced by the written contract.

It thus appearing that the subjects with which the parties dealt in their negotiations are the same in both contracts, the written and the alleged verbal contract, it follows that the alleged parol agreement cannot be held to constitute the consideration or inducement for entering into the written contract, nor can the parol agreement be held to be collateral to such written agreement. Neither are we disposed to adopt the fraud theory which seems to prevail in Pennsylvania. It does not help plaintiff's contention to style the result of the transaction a fraud, when it is considered that the writing itself was freely signed, with admitted knowledge of its entire contents and meaning. Atchison, T. & S. F. Ry. Co. v. Vanordstrand, 67 Kan. 386, 73 Pac. 113.

[2] As to the second cause of action, the defendant was authorized to discharge the plaintiff when it should consider his work unprofitable or undesirable. This constituted defendant the judge of when plaintiff's work was profitable or unprofitable to it, or whether it was desirable that it be continued. Having discharged the plaintiff summarily and without specifying its reasons therefor, it is probable that it was for one of these causes.

These considerations lead to the affirmance of the judgment, and it is so ordered.