### CONWAY et al. v. WHITE.

(District Court, D. Connecticut. June 30, 1924.)

No. 1625.

**1. Master and servant ⬤62—Inventions of employee held not within contract requiring him to hold inventions made during term in trust for employer.**

Inventions of an employee, for which applications for patents were pending at the time of his discharge, and which by the terms of his contract were to be the property of the employer, if made during the employment, held, on the evidence, to have been made, or the essential and material parts of them made, prior to the contract, and not within its provisions.

**2. Master and servant ⬤62—Trust to assign patents to employer.**

In a suit to enforce a trust under a contract of employment providing that inventions made by the employee during the term should be the property of the employer and be assigned to it on demand, the employer held to have been in default on and at all times after the dates when the inventions were alleged to have been made and the assignment demanded, and not to have become vested with the equitable title to the inventions.

In Equity. Suit by Earle E. Conway and others, trustees, against Frank C. White. Decree for defendant.

See, also, 292 Fed. 837.

Louis W. Southgate, of Worcester, Mass., Robert C. Cooley, of Springfield, Mass., and O. Ellery Edwards, of New York City, for plaintiffs.

Robert C. Mitchell and George H. Mitchell, both of New York City, for defendant.

THOMAS, District Judge. Plaintiffs, as trustees under what is generally known as a Massachusetts trust, and operating under the names Hallet & Davis Piano Company and Simplex Player Action Company, bring this bill in equity to compel defendant to assign to them all defendant's rights, title, and interest in and to certain pending applications for United States letters patent and in the inventions set forth therein. Plaintiffs acquired from Norman November, purchaser at a trustee's sale, all of the assets of the Wilcox & White Company, a corporation which on July 26, 1921, was adjudicated a bankrupt, and which is now defunct. It appears that the purchase was made with notice of defendant's claim of ownership to these applications.

The basis of this action is found in a contract made on March 25, 1920, between defendant and the said Wilcox & White Company. This contract provided, inter alia, for the employment of defendant by the company as its mechanical engineer for a period of five years, commencing April 1, 1920. It also provided for a salary of $8,000 to be paid to defendant for the first year, and for $1,000 additional in each succeeding year, thus assuring defendant a total of $50,000 for the full term of the contract, these payments to be made in equal monthly installments at the end of each month. Defendant agreed to serve the company for the full period as its mechanical engineer, and further agreed to assign to it such inventions as were made by him during the contractual period. In the contract the following clauses appear:

"Third. The party of the first part is engaged in the manufacture of player pianos, reproducing pianos, and mechanical devices in connection therewith and with musical instruments generally, and in the manufacture of music rolls and other appurtenances used with such pianos and musical instruments, and that said manufacture is carried on by means of certain patents, secret methods, processes, tools, machinery, devices, and appliances, and the same are the property of the party of the first part and intended to be kept secret, and all knowledge and information which the party of the second part [the defendant] now possesses or shall hereafter acquire respecting said secrets, and all inventions and discoveries made by the party of the second part during the term of his employment, shall at all times and for all purposes be regarded as acquired and held by the party of the second part in a fiduciary capacity and solely for the benefit of the party of the first part.

"Fourth. The party of the second part agrees that he will, when required, make and execute any and all instruments in writing that may be deemed by the party of the first part proper and necessary, to transact and vest in the party of the first part the entire right, title, and interest in all inventions and discoveries made by the party of the second part, during the term of his employment, which in any way may affect any articles manufactured by the party of the second part, and used or capable of being used in the business of the party of the first part."

Plaintiffs contend that the inventions upon which applications for letters patent are now pending in the name of the defendant, and serially numbered 440,296 and 455,346, should be assigned to them on the

ground that these inventions were "made" "during" the term of the contract and at a time when the Wilcox & White Company was not in default thereunder. Plaintiffs are not seeking to enforce specific performance, but rather to enforce an alleged trust springing out of the relation existing between the Wilcox & White Company and defendant, which relation was governed and determined by the aforesaid stipulations of the agreement; and, in so far as the trust is an executed trust, they seek a decree in this court compelling the transfer or assignment to the cestui que trustent. Plaintiffs also claim to be entitled to another patent application, serial No. 514,585 (not specifically mentioned in the bill of complaint), which was filed by defendant on November 12, 1921, which will hereinafter be considered.

The first two of the above applications was filed by defendant subsequent to March 25, 1920, before the Wilcox & White Company's adjudication in bankruptcy, and before defendant was discharged by the receivers in bankruptcy on July 28, 1921. Application No. 514,585 was filed on November 12, 1921, which was after defendant's discharge, and six months before the sale of the company's assets. Plaintiffs claim that the inventions disclosed in the first two applications were "made" by defendant "during" the contractual period. Defendant controverts all of these allegations. He insists that, the Wilcox & White Company having been in default under the contract in suit, a court of equity should not find an executed trust in favor of that corporation's successors in any event. He also takes the broad position that the inventions sought by plaintiffs were not "made" during the period of the contract. When this case was before the Circuit Court of Appeals on the motion to dismiss (292 Fed. 837), it was held by Judge Rogers, on page 846, that if the company—

"was not in default under the contract when the defendant made the inventions in suit, was not in default when the defendant made his applications for the patents, and was not in default when the company required him to execute the papers necessary to transfer and vest in it the entire right, title, and interest in the inventions in suit, it was then the owner of those inventions in equity, being possessed of vested rights therein."

It therefore becomes necessary for this court to determine from the proofs the following questions: (1) Were the inventions actually made during the period of the contract? and (2) if so made, was the company at such time in default under the contract? These questions will now be considered.

[1] As to application No. 440,296, filed January 27, 1921, for what is termed a "transposing mechanism," no testimony of any kind was submitted by plaintiffs as to the time when, in fact, this invention was "made." Plaintiffs have apparently rested upon the presumption, raised by the date of the filing of this application, that it was "made" or reduced to practice at that time. On the other hand, the defendant positively testified that this invention was made during the summer of 1919. No attempt was made to contradict this testimony, and I am, in view of its positive and unequivocal nature, compelled to conclude that this invention was not "made" during the period of defendant's employ under the contract.

As to application No. 455,346, filed March 24, 1921, for certain improvements in a player piano of the "drawer player type," it is alleged by defendant that "the essential and material parts" of this invention were made by him prior to the date of the contract, and therefore that it was not within the 'purview thereof. In this contention defendant has the support of the Circuit Court of Appeals; Judge Rogers having, in the opinion of the court (page 841), ruled that proof of this allegation at the trial would constitute a good defense as to this application.

What the "essential and material parts" of the invention are can only be ascertained by comparing the subject-matter disclosed in this application with the prior art. The player disclosed in the application is of the "drawer player" type, in which the various player action parts are mounted on a drawer carried beneath the key bed of the piano, and movable in and out. The "Ampico" player piano is a well-known example of a player of this "drawer type," that has been on the market since prior to the date of the contract. In this instrument the various player action parts are mounted on a movable drawer, with the exception of the striking pneumatics, which are mounted on a stationary part of the key bed. The player mechanisms on the movable drawer are connected to the striking pneumatics by 80 or more small rubber tubes, which, being flexible, allow the drawer to be moved in and out, thus permitting the piano to be played mechanically in either position thereof—a feature of importance.

The Day British 'patent, No. 17,644 of 1911, is also for a player piano of the "drawer type," in which the patentee sets forth that "the whole pneumatic action," including the striking pneumatics, is mounted on a movable drawer carried under the key bed and movable in and out. This patent refers to the then known employment of "flexible tubes," to permit the drawer to be moved in and out. The patent specification clearly points out that, inasmuch as such tubes are "liable to perish," one object of the invention is to provide a construction which will dispense with such perishable 'parts. To accomplish this end, Day mounted the striking pneumatics on the drawer and then provided a mechanical transmission means between the "striking pneumatics and the piano keys"; but this transmission means is so constructed that the piano can be mechanically played only when the drawer is in its extreme "out" position; the transmission means being disconnected when the drawer is in all other positions.

Now, turning to the construction disclosed in defendant's application under consideration, I find that it illustrates the well-known "drawer," containing thereon the various player parts, including the striking 'pneumatics, as in the Day British patent. It also includes mechanical transmission means for transmitting the power from each striking pneumatic to its companion piano key; but, unlike the Day construction, defendant's transmission means is so made that it will transmit power to the piano keys, whether the drawer is pushed in or pulled out. Each individual transmission train includes an elongated crank called a "roller wire," with a driving 'part and a driven part engaging the opposite sides thereof, one of said parts being longitudinally movable thereon, so that the several parts of the train will remain in operative

contact in different positions of adjustment and will not be separated as in Day. The driving part is connected with the striking pneumatic, and the driven part with the piano key. By this construction defendant made possible the mechanical operation of the piano, whether the drawer action was "in" or "out," and so gained this important benefit, which is absent in the Day construction. That this roller wire transmission is the main and important feature of novelty and utility of the invention disclosed in the application I have no doubt. Porter, an employee in the Ampico department of the Chickering Piano Company and formerly with the Wilcox & White Company, testified that the "main difference" in defendant's construction, as embodied in a drawer player, over the old "Ampico," resided in locating the striking pneumatics on the drawer and providing the "roller wires 8," which kept the player action in continuous contact with the piano keys. Brown, a patent expert of large experience, testified that:

"It is important in these pianos that the instrument should be played both when the drawer is pulled out and when the drawer is pushed in."

It thus appears that defendant's transmission means is the crux of the case, and as such constitutes the "essential and material" part of the invention. If it appears that defendant made and successfully tested, prior to the execution of the contract, a transmission means corresponding to the one disclosed in this application, defendant has, according to the view expressed by the Circuit Court of Appeals, supra, as I understand it, a good defense. It has been proven by the testimony of defendant, fully and clearly corroborated by three witnesses, Hayward, Thompson, and Donovan, that in 1904 defendant made and installed in a single sample instrument of the "cabinet player" type the same roller wire power transmission means as is disclosed in this application. These witnesses stand unimpeached, and their testimony is uncontradicted. A full disclosure of this transmission means is found in defendant's application, serial No. 514,585, filed November 21, 1921, and also in other drawings in evidence. This transmission was successfully tested in this instrument at the factory of the Wilcox & White Company in 1904. It was then taken to London, England, to show to Sir Herbert Marshall & Sons, Limited, dealers in Wilcox & White instruments. It was successfully demonstrated at the Marshall's stores and at Victoria Hall in London. In view of the positive and unequivocal nature of the proofs concerning the making and successful testing of this transmission means in 1904, I conclude, and therefore hold, that the "essential and material parts" of the invention, as disclosed in application, serial No. 455,346, were "made" by defendant prior to the execution of the contract, and that defendant's defense as to his rights in this application is established.

We now come to application No. 514,585, filed November 12, 1921. This shows defendant's roller wire transmission mechanism as first used by him in a piano player. Plaintiffs demand that this application shall be assigned to them, and attempt to justify such demand under the secrecy clause of paragraph 3 of the contract. This paragraph draws a distinct line between "secret methods, processes, tools, machinery, devices, and appliances," by means of which the business of

the company was being "carried on," on the one hand, and "inventions and discoveries made by the party of the second part," on the other hand. As to the former, it requires that all knowledge and information respecting such "secrets" shall be held by defendant in a fiduciary capacity, while as to the latter, only such "inventions and discoveries as were made by defendant during the term of his employment" are to be held by him in such capacity. Since this roller wire transmission was an invention, and was made by defendant prior to the execution of the contract, it is clear that it does not come within the scope of this contract.

Plaintiffs urge that the invention contained in the 1904 instrument belonged to the Wilcox & White Company on the theory that defendant, with other members of his family, was at that time engaged in a common enterprise, from which it is claimed that a trust should be presumed. It is true that the testimony shows that the White family had a controlling interest in the Wilcox & White Company in 1904, and that defendant was one of the stockholders. It also appears, however, that he was employed as mechanical superintendent, but without any understanding or agreement whatsoever relative to the assignment of inventions or patents. Defendant did, in fact, assign many of his patents to the company; but this was shown to have been entirely voluntary on his part. It does not appear that the invention of this application was ever adopted by the company or ever patented, and in the absence of any agreement between defendant and the Wilcox & White Company prior to 1920 relating to inventions and patents, there is no basis whatever for the presumption of a constructive trust, which would require defendant to assign the application and invention.

Plaintiffs cite and rely upon the doctrine laid down by the Circuit Court of Appeals for the Seventh Circuit in National Wire Bound Box Co. et al. v. Healey, 189 Fed. 49, 110 C. C. A. 613, in support of their contention; but that case seems not in point, as it involved a true common enterprise, in which the parties had expressly agreed to assign their respective inventions for the benefit of the participants in the enterprise. No such facts are present in the case at bar. I therefore conclude and hold that this application and invention is the sole and exclusive property of the defendant inventor.

Plaintiffs also contend, and ask the court to find, that the subject-matter of this application was abandoned. There is no proof of abandonment to support the claim. The fact that it was not adopted by the company is not evidence of abandonment by the inventor. Furthermore, the testimony furnishes a satisfactory explanation of why it was not adopted by the company. Defendant has also testified that he never had occasion to again use the particular power transmission embodied in the single 1904 instrument until he utilized it in the drawer type player shown in his application, serial No. 514,585, and that the invention had not been abandoned by him. My conclusion on this aspect of the case is that none of the inventions sought by plaintiffs were made by defendant during the period of his employment under the contract in suit, and that the inventions and applications therefor were not abandoned by him and are exclusively the property of the defendant inventor.

[2] Now, as to the second question: Was the company in default at the time plaintiffs claim defendant made the inventions and filed applications therefor? From a careful consideration of the voluminous testimony, and especially that of Charles H. Warfield, treasurer of the company, I am satisfied that from September or October, 1920, down to the date of bankruptcy in July, 1921, the company was practically insolvent and unable to meet its obligations. During that entire period it appears that defendant was not paid his salary installments, either on time or in full, as the contract required, so that, when discharged by the receivers, a large amount was still due him. Plaintiffs' witness Porter testified that the drawer type player shown in application, serial No. 455,346, was completed in November, 1920, and this I must accept as the date plaintiffs claim this invention was "made" by defendant. If, for the purposes of this case it were necessary for me to rule on this point, I should be disposed to find that the company was in default at the time plaintiffs claim defendant made the inventions, at the time defendant filed the applications sought, and at the time demand for assignment was made, and that it would be inequitable to hold that defendant was then bound, or should now be required to assign his invention.

In reaching this conclusion I have not disregarded the plaintiffs' claim that a certain check, dated March 25, 1921, was mailed to defendant, the amount of which was intended to make up or cover previous short or overdue payments; but there is no adequate proof that this check was delivered to or received by the defendant prior to March 31, 1921, when the company again failed to meet its obligation to defendant. On the other hand, defendant has testified that this check was not received by him until after April 2, 1921, the date of his father's death. The fact that the check was not cashed until April 21, 1921, is a sufficiently corroborating circumstance to justify belief in defendant's testimony. If there was any reasonable doubt, I would resolve it in favor of defendant, in view of the financial loss as well as loss of employment suffered by him in the failure of the company to meet its contractual obligations to him.

There will be a decree for defendant, dismissing the bill, with costs.